# District of Columbia
# Court of Appeals

**No. 15-CF-324**

CHRISTINA BELT,

Appellant,

FILED
DEC - 8 2016
DISTRICT OF COLUMBIA
COURT OF APPEALS

v.

**CF3-15577-13**

UNITED STATES,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE: BLACKBURNE-RIGSBY and BECKWITH, *Associate Judges*; and BELSON, *Senior Judge*.

**J U D G M E N T**

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the judgment on appeal is affirmed, and the matter is remanded solely for merger.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: December 8, 2016.

Opinion by Associate Judge Anna Blackburne-Rigsby.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CF-324

CHRISTINA BELT, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED  **12/8/16**
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court of the
District of Columbia
(CF3-15577-13)

(Hon. A. Franklin Burgess, Jr., Trial Judge)

(Argued March 17, 2016                    Decided December 8, 2016)

*Daria J. Zane* for appellant.

*Peter S. Smith*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, and *Mark A. Aziz*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY and BECKWITH, *Associate Judges*, and BELSON, *Senior Judge*.

BLACKBURNE-RIGSBY, *Associate Judge*:   After a jury trial, appellant Christina Belt was convicted of assault with significant bodily injury ("felony assault") while armed, assault with a dangerous weapon ("ADW"), simple assault, and leaving the scene of a collision, stemming from her assault of her former

friends, Cynthia Spenard and James Tolbert III.[1] As a result of appellant's assault with a "meat cleaver," Mr. Tolbert sustained an inch-long laceration to his forehead and an inch-and-a-half long laceration to his shoulder. On appeal, appellant primarily argues that there was insufficient evidence that the laceration to Mr. Tolbert's forehead and shoulder by the meat cleaver amounts to a "significant bodily injury" to sustain her conviction of felony assault. Appellant also argues that there was insufficient evidence to sustain her other convictions, and that the trial court plainly erred when it failed to *sua sponte* preclude the government from making certain arguments during its closing. We affirm the jury's conclusion that Mr. Tolbert's injuries amounted to a "significant bodily injury" under the District of Columbia's felony assault statute. We also affirm appellant's other convictions, and remand this case solely for the trial court to merge appellant's felony assault and ADW convictions.[2]

---

[1] *See* D.C. Code §§ 22-404 (a)(2), -4502 (a)(2) (2012 Repl.), D.C. Code § 22-402 (2012 Repl.), D.C. Code § 22-404 (a)(1) (2012 Repl.), and D.C. Code § 50-2201.05c (a)(1) (2013), respectively. Appellant's convictions for felony assault, ADW, and leaving the scene of a collision relate to her conduct towards James Tolbert III, while her simple assault conviction relates to her conduct towards Cynthia Spenard.

[2] The government does not oppose appellant's request for merger. *Nero v. United States*, 73 A.3d 153, 159 (D.C. 2013).

## I.      Factual Background

The government's evidence at trial showed that appellant assaulted her friends Cynthia Spenard and James Tolbert III in two separate but related incidents on the night of August 31, 2013, and into the early-morning hours of September 1. That evening, residents of the apartment complex located at 4220 9th Street, Southeast, Washington, D.C. were congregated outside socializing and drinking beers and spirits.   Among them were appellant, whose parents lived at the apartment complex, Ms. Spenard, and Mr. Tolbert, who went by the nickname "Stink."[3]

Ms. Spenard became "very intoxicated" and spilled beer on appellant a few times, possibly on purpose.  Appellant became upset by Ms. Spenard's actions and, in response, according to Ms. Spenard, "pulled" her to the ground and dragged her

---

[3]  Other individuals who were outside or around the area at the time included Jose Colon, the apartment complex's maintenance person, Herod Murray III ("Herb"), Jason Smith ("Shaq"), and Deborah Fountain.   In addition to Ms. Spenard and Mr. Tolbert, these four individuals were eyewitnesses to at least some of the attacks and testified on behalf of the government.

across the sidewalk and across some broken shards of glass.[4] Ms. Spenard suffered cuts and bruises to her arms, legs, and stomach. After the fight between the two women was broken up, appellant contacted her boyfriend, Rodney Lawrence, to come pick her up in his car. When Mr. Lawrence arrived, appellant placed her five-year-old son in the backseat and was about to get in and pull off. Before she could do so, however, Mr. Tolbert called out to her asking for a cigarette. Appellant was apparently very angered by this request and started to curse at Mr. Tolbert. She then escalated the incident by pulling out a meat cleaver and threatening Mr. Tolbert with it. Mr. Lawrence attempted to deescalate the situation by standing between appellant and Mr. Tolbert, but appellant nonetheless swung the meat cleaver at Mr. Tolbert, narrowly missing him, and Mr. Tolbert in response punched appellant in the head. Mr. Tolbert then tried to walk away, but appellant chased him down and hit him on the head with the meat cleaver, causing an inch-long laceration to his forehead and an inch-and-a-half long laceration to his shoulder. His head was bleeding and blood dripped down his shirt and onto the ground. Mr. Tolbert testified that he felt "dizzy" from the strike and blacked out for a short period of time. Appellant ran to Mr. Lawrence's car, got into the

---

[4] Mr. Colon and Mr. Smith testified, however, that it was Ms. Spenard who attempted to first punch appellant before appellant grabbed her. Mr. Murray, on the other hand, claimed that appellant pulled a knife on Ms. Spenard.

driver's seat, and attempted to drive away.[5]  But Mr. Tolbert chased her down and tried to "snatch her out" of the car.  He was unsuccessful, however, because appellant "stepped on the gas" and ran over Mr. Tolbert's ankle, breaking it in two places in the process.  Appellant left Mr. Tolbert bloodied on the ground in the parking lot, and he was soon taken to the hospital by ambulance, where he received four stitches to his head and "strips" on his shoulder to help it heal.  The doctors later inserted two screws into his broken ankle.

Appellant's defense theory at trial was that she had acted in self-defense in both cases.  Appellant took the stand and testified that she tried to reason with Ms. Spenard after she became intoxicated and only grabbed her to prevent Ms. Spenard from hitting her.  She also claimed to have had only one beer the whole day.  Both appellant and her boyfriend, Mr. Lawrence, testified that Mr. Tolbert struck appellant first.  Although all of the witnesses, including defense witness Mr. Lawrence, described the assaulting weapon as a "meat cleaver," appellant during her testimony called it a "metal kind of . . . handled spatula-looking thing."  Appellant also denied knowing that she had hit Mr. Tolbert with the car.  The jury heard the evidence including eyewitness testimony and found appellant guilty of

---

[5]  Appellant's son was in the back of the car, but her boyfriend was outside of the car.

assaulting Ms. Spenard and Mr. Tolbert, and for leaving Mr. Tolbert after running him over with the car.[6]  This appeal followed.

## II.    Discussion

### A. Sufficiency Challenges

The standard for reviewing sufficiency challenges is well-settled.  This court "must view all of the evidence in the light most favorable to the government and give deference to the right of the fact finder to weigh the evidence, determine the credibility of the witnesses, and draw all justifiable inferences of fact, making no distinction between direct and circumstantial evidence."  *Smith v. United States*, 899 A.2d 119, 121 (D.C. 2006) (citations, internal quotation marks, and brackets omitted).  Appellant challenges the sufficiency of the evidence supporting all of her convictions.[7]  We address each argument in turn.

---

[6]  The jury acquitted appellant of operating a motor vehicle while impaired, D.C. Code § 50-2206.11 (2013), and second-degree cruelty to children (for driving with her son in the back seat), D.C. Code § 22-1101 (b) (2012 Repl.).

[7]  Preliminarily, the government argues that we should review appellant's challenges to her felony assault and simple assault convictions for plain error only, because defense counsel conceded during appellant's motion for judgment of acquittal ("MJOA") that there was enough evidence for these claims to go before

(continued…)

### 1. Felony Assault

Appellant argues that her conviction for felony assault while armed (meat cleaver) of Mr. Tolbert must be reversed because he did not suffer a "significant bodily injury."[8]  For the reasons that follow, we conclude that the evidence was sufficient to support this conviction.

Our case law on what does or does not constitute sufficient evidence to sustain a felony assault conviction has been at times unclear.  *Compare In re R.S.*, 6 A.3d 854, 859 (D.C. 2010) (unarmed assault causing laceration to ear requiring stitches constitutes felony assault), *and Rollerson v. United States*, 127 A.3d 1220, 1232 (D.C. 2015) (gashes to the victim's face going down to the "white meat" and requiring stitches constitutes felony assault), *with Nero*, *supra* note 2, 73 A.3d at

---

(…continued)

the jury.  We need not decide whether the government is correct, however, because appellant's arguments lack merit even if preserved.  *See generally Lewis v. United States*, 10 A.3d 646, 657 (D.C. 2010) ("'Even though a general motion for acquittal is broadly stated, without specific grounds, it is deemed sufficient to preserve the full range of challenges to the sufficiency of evidence.'  In contrast, where the defense 'fails to make even a general motion for a judgment of acquittal in a jury trial the plain error test will govern this court's review.'") (citations and alterations omitted).

[8]  The felony assault charge pertains only to appellant's attack with a meat cleaver, so Mr. Tolbert's injuries to his ankle resulting from subsequently being run over by appellant's car cannot be considered as evidence to this charge.

159 (gunshot wound requiring wound care and pain medication not sufficient for felony assault), *and Wilson v. United States*, 140 A.3d 1212, 1217-18 (D.C. 2016) (evidence of blood "gushing" from the victim's face, lacerations, treatment including a neck brace and cuff on arms, and victim's statement that he suffered "great pain" not sufficient for felony assault). As such, preliminarily, we take the time to review the intent of the Council of the District of Columbia in enacting the felony assault statute and to reiterate the elements of the crime.

Felony assault is committed when a person "unlawfully assaults, or threatens another in a menacing manner, and intentionally, knowingly, or recklessly causes significant bodily injury to another . . . ." D.C. Code § 22-404 (a)(2)). Further, the statute defines the term "significant bodily injury" as "an injury that requires hospitalization or immediate medical attention." *Id.* As we observed in *In re R.S.*, felony assault was added to the list of criminal offenses in the District of Columbia relatively recently to "fill the gap between aggravated assault and simple assault." 6 A.3d at 858 (citations and internal quotation marks omitted). While "[t]he original draft of the bill used the language 'bodily injury,'" the Public Defender Service for the District of Columbia recommended that it be changed to "significant bodily injury" to incorporate injuries "more serious than mere 'bodily injury' [such as slapping] but less serious than 'serious bodily injury.'" *Id.* (citing

Letter of the Public Defender Service for the District of Columbia to Chairman Mendelson of the Committee on the Judiciary, at 12 (July 14, 2005)). The Council of the District of Columbia ("Council") adopted that "significant bodily injury language," so that felony assault requires a showing of "significant bodily injury" and carries a maximum prison term of three years. Felony assault was intended as a bridge between the offense of simple assault, which requires no showing of any injury whatsoever and carries a maximum prison term of only 180 days, and aggravated assault, which requires a strict showing of "serious bodily injury"[9] and carries a potential ten year sentence. *Id.* at 857-58; *see also* D.C. Code §§ 22-404 (a)(1) & (a)(2); D.C. Code § 22-404.01 (b). The Council thus intended the crime of felony assault to cover assaults that result in "significant (but not grave) bodily injury." *Id.* at 858 (quoting D.C. Council, Committee on the Judiciary, Report on Bill 16–247, at 5-6 (Apr. 28, 2006)).

The Council's intent as to what constitutes "significant" but not "grave" bodily injury, however, has been harder to articulate. The intermediate felony

---

[9] A "serious bodily injury" is an injury that is usually "life-threatening or disabling. The victims typically required urgent and continuing medical treatment (and, often, surgery), carried visible and long-lasting (if not permanent) scars, and suffered other consequential damage, such as significant impairment of their faculties. In short, these cases have been horrific." *Swinton v. United States*, 902 A.2d 772, 775 (D.C. 2006).

assault statute defines the term "significant bodily injury" as "an injury that requires hospitalization or immediate medical attention." D.C. Code § 22-404 (a)(2)). The D.C. Attorney General, in addressing a prior version of the bill that spoke of "bodily injury," testified on the need for an intermediate assault crime that included "cases involving a victim who has been seriously beaten, sometimes leaving the victim with black eyes, lacerations, broken bones, or serious bruising all over the body." *In re R.S.*, *supra*, 6 A.3d at 858 (quoting Testimony of Robert J. Spagnoletti, Attorney General, Public Hearing on B16–247 the Omnibus Public Safety Act of 2005, at 15 (May 31, 2005)) (brackets omitted).

In *In re R.S.*, this court adopted the trial court's (Byrd, J.) definition:

> [W]here there is an injury to the body . . . that necessitates the individual being taken to the hospital or receiving medical treatment shortly after the injury was inflicted. Hospitalization or medical treatment is required where it is necessary to preserve the health and well[-]being of the individual, e.g., to prevent long-term physical damage, possible disability, disfigurement, or severe pain.

*Id.* at 859 (emphasis added). We further explained in *In re R.S.* that the Council's intent was that the "threshold for significant bodily injury [should be] markedly less severe than that for aggravated assault." *Id.* This court said that whether immediate medical attention or hospitalization occurs or does not occur is not the

controlling factor, rather, the "focus" must be on "the nature of the injury itself and the *practical need in the ordinary course of events for prompt medical attention.*" *Id.* at 859 (emphasis added). The term "immediate medical attention" and the issue of whether the victim required hospitalization are objective inquiries. The question is not whether hospitalization actually occurred. "[T]he fact that the treatment happened to be administered at a hospital is not determinative." *Id.* Consequently, the mere fact that the victim received outpatient care would not, of itself, satisfy the significant bodily injury element of the crime. *See e.g.*, *Teneyck v. United States*, 112 A.3d 906, 909 n.4 (D.C. 2015).

Since *In re R.S.*, our case law has expounded further on this definition, and we have clarified that "the immediate medical attention must be aimed at one of two ends — preventing long-term physical damage and other potentially permanent injuries *or* abating pain that is severe instead of lesser, short-term hurts." *Id.* at 909 (emphasis added) (citations and internal quotation marks omitted). In other words, there are two independent bases for a fact finder to conclude that a victim has suffered a significant bodily injury: (1) where the injury requires medical treatment to prevent "long-term physical damage" or "potentially permanent injuries"; or (2) where the injury requires medical treatment to abate the victim's "severe" pain. But again, the "relevant inquiry is not whether a person in

fact receives immediate medical attention but *whether medical treatment beyond what one can administer himself is immediately required* to prevent 'long-term physical damage, possible disability, disfigurement, or severe pain.'" *Id.* (emphasis added) (quoting *In re R.S.*, *supra*, 6 A.3d at 859).

On the basis of our case law, we can summarize the definition of "significant bodily injury" as follows:  to qualify as a "significant bodily injury," the nature of the injury itself must, in the ordinary course of events, give rise to a "practical need" for immediate medical attention beyond what a layperson can personally administer, either to prevent long-term physical damage or to abate severe pain. *See In re R.S.*, *supra*, 6 A.3d at 859; *see also Teneyck*, *supra*, 112 A.3d at 909-10. Accordingly, where that medical treatment can only be prescribed or administered by trained medical professionals, such as with stitches, *see In re R.S.*, *supra*, 6 A.3d at 859; *Rollerson*, *supra*, 127 A.3d at 1232, the fact finder may be able to infer from the course of the medical treatment itself — treatment that is beyond "mere diagnosis" or simple "everyday remedies such as ice packs, bandages, and self-administered over-the-counter medications," *Nero*, *supra* note 2, 73 A.3d at 158 — that immediate medical attention was "required," and thus the victim had suffered a "significant bodily injury." *Cf. Quintanilla v. United States*, 62 A.3d 1261, 1265 (D.C. 2013) (observing that "significant bodily injuries" do not include

injuries that "although seemingly significant enough to invite medical assistance, do not actually 'require' it"). Neither the felony assault statute nor our case law requires any additional evidence (such as medical or other expert witnesses) to substantiate that the immediate medical attention that the victim received was actually necessary. Rather, the focus as always is on "the nature of the injury itself and the practical need in the ordinary course of events for prompt medical attention," *In re R.S.*, *supra*, 6 A.3d at 859.

Further, the jury or fact finder may draw reasonable inferences from probative evidence of the "nature of the injuries and the victim's reactions to them," *Swinton*, *supra* note 9, 902 A.2d at 777, that medical attention would be necessary to abate severe pain, a separate theory for conviction of felony assault. *See Teneyck*, *supra*, 112 A.3d at 909; *In re R.S.*, *supra*, 6 A.3d at 859. It is squarely within the purview of the jury to make factual findings or reasonable inferences from probative evidence as to whether a victim suffered "severe pain." Every day, trial courts entrust juries with the task of deciding difficult factual issues. *See, e.g.*, *Diamond v. Davis*, 680 A.2d 364, 379 (D.C. 1996) (stating in the context of a fraud claim that "[w]e daily entrust to judge and jury the task of assessing the bounds of reasonable conduct in every manner of human endeavor."). In this jurisdiction, juries have long been required to determine whether a victim

suffered "extreme physical pain" in the aggravated assault context. The jury's ability to determine whether a victim suffered "severe pain" in the felony assault context is fundamentally no different, even accounting for the different threshold of pain in the felony assault context. *Swinton*, *supra* note 9, 902 A.2d at 777. Of course, the "extremity of the victim's pain must be established by probative evidence, not left to the jury's untethered speculation," but "[a] victim need not use the specific word 'extreme' [or 'severe'] to describe her [or his] pain, and even absent graphic descriptions of suffering from the victim herself [or himself] or other witnesses, a reasonable juror may be able to infer that pain was extreme [or severe] from the nature of the injuries and the victim's reaction to them." *Id.* Accordingly, there may be instances where the fact finder can infer based on its "common sense" and every day experiences that the victim was in "severe" pain on account of evidence of the victim's injuries and the victim's reactions to them. *See Brocksmith v. United States*, 99 A.3d 690, 697 (D.C. 2014) (jury is entitled to draw a "vast range of reasonable inferences from the evidence" using its "common sense" and every day experiences) (citations and internal quotation marks omitted); *see also Wilson*, *supra*, 140 A.3d at 1221-22 (Belson, J. dissenting) (explaining that the jury should be allowed to infer from the seriousness of the victim's injuries that immediate medical attention was necessary).

The instructions given to the jury here regarding "significant bodily injury" emphasize the role of the jury to make those "common sense" inferences. The trial court's instruction in this case gave the jury the correct statement of the law that is set forth in the standard Redbook instruction defining "significant bodily injury":

> For this offense, "significant bodily injury" means an injury that required hospitalization or immediate medical attention in order to preserve the health and well-being of the individual. The fact that an individual who was injured did or did not seek immediate medical attention, was or was not transported by ambulance to a hospital, or did or did not receive treatment at a hospital is not determinative of whether hospitalization or immediate medical attention was required. Instead *you must* consider the nature of the alleged injury itself and the practical need in the ordinary course of events for hospitalization or prompt medical attention in determining whether significant bodily injury occurred here.

(Emphasis added). *See* Criminal Jury Instructions for the District of Columbia, No. 4.102 (5th ed. 2015).

Turning to the case at hand, the evidence shows that appellant attacked Mr. Tolbert with a meat cleaver. She struck him directly on the forehead, which caused an inch-long laceration, and an additional one-and-a-half inch long laceration to Mr. Tolbert's shoulder. Mr. Tolbert testified that afterwards he felt "shocked," a "little dizzy" and "disoriented," and that he had a "little black out spell" from the strike; his head was bleeding so much that it flowed onto his

clothes and the ground, and he was taken to the hospital after appellant ran over his foot where medical personnel administered four stitches to his forehead wound and some "strips" for his shoulder wound. The evidence that Mr. Tolbert was taken by ambulance to the hospital within minutes of the attack, that he had lost consciousness, and that he was bleeding profusely from the head and required four stitches was sufficient to establish that "immediate medical attention" was necessary to prevent "long-term physical damage or other potentially permanent injuries." *Teneyck*, *supra*, 112 A.3d at 909. This case is factually no different from the injuries that we found sufficient to constitute felony assaults in *In re R.S.* and in *Rollerson*. Similarly, Mr. Tolbert required stitches — medical treatment that is beyond what a layperson could administer. Following the standard jury instructions, the jury was entitled to draw the reasonable inferences from the evidence in this case and find that "immediate medical attention" was necessary, and that Mr. Tolbert suffered an injury serious enough to constitute a "significant bodily injury."[10] Accordingly, we affirm appellant's conviction for felony assault

---

[10] Our recent decision in *In re D.P.*, 122 A.3d 903, 913 (D.C. 2015) is not in tension with our holding here. Rather, *In re D.P.* simply observed that on the facts of that case — a fight that caused the victim to suffer "brief unconsciousness," "bruising," and "minor headaches" — the injuries did not require medical attention and were insufficient to constitute a "significant bodily injury." *Id.* at 906, 913. The attack here with the meat cleaver that caused the one-inch gash to Mr. Tolbert's forehead, dripped blood, required four stitches, and caused dizziness and a momentary blackout is distinguishable.

of Mr. Tolbert on the ground that the injury required immediate treatment to prevent long-term damage.[11] *In re R.S.*, *supra*, 6 A.3d at 859.[12]

The injury that occurred here was more serious than a misdemeanor simple assault, such as a slapping, punching, or spitting incident. *Stroman v. United States*, 878 A.2d 1241, 1245 (D.C. 2005) (striking with a "flip flop" sufficient for simple assault); *Ray v. United States*, 575 A.2d 1196, 1197 (D.C. 1990) (spitting sufficient for simple assault). Nor need we say that the injury here was as serious as an aggravated assault that was "life-threatening" or "horrific." *Swinton*, *supra* note 9, 902 A.2d at 775. Because the injury sustained by Mr. Tolbert is consistent with the legislative intent of the felony assault statute, defined as an "intermediate" level of assault, and consistent with our case law, we affirm appellant's felony assault while armed conviction.

---

[11] Appellant also argues that the evidence was insufficient to prove that she did not act in self-defense when she attacked Mr. Tolbert because he was acting aggressively towards her and her child as he approached the car. On the contrary, several witnesses testified that Mr. Tolbert asked appellant for a cigarette before she took out the meat cleaver, and that he only struck her after she took a swing at him. Further, appellant struck Mr. Tolbert as he attempted to walk away from the fight. Accordingly, the evidence was sufficient to disprove appellant's claim of self-defense. *See Rorie v. United States*, 882 A.2d 763, 771-72 (D.C. 2005).

[12] Because we conclude that the evidence was sufficient to find that Mr. Tolbert suffered an injury that required "immediate medical attention" to prevent long-term physical damage, we need not decide whether the evidence was also sufficient to find that he was in "severe pain."

## 2. Simple Assault

Appellant argues there was insufficient evidence to disprove her claim of self-defense as to simple assault of Ms. Spenard. Specifically, she claims that the altercation started only after Ms. Spenard took a swing at her first, citing to Mr. Colon's and Mr. Smith's testimony. *See supra* note 4. To invoke the defense of non-deadly self-defense, there must be evidence that the defendant "reasonably believed that harm was imminent." *Ewell v. United States*, 72 A.3d 127, 131 (D.C. 2013) (citation and internal quotation marks omitted). Moreover, "a defendant cannot claim self-defense if the defendant was the aggressor, or if s/he provoked the conflict upon himself/herself." *Rorie*, *supra* note 11, 882 A.2d at 772 (citation and internal quotation marks omitted).

Here, appellant's claim of self-defense fails for two reasons. First, Ms. Spenard herself testified that she did not "know how it all started," and that all she remembered was that she poured beer on appellant before she was grabbed and thrown on the ground. Further, Mr. Murray testified that he saw appellant arguing with Ms. Spenard while appellant held a knife in her hand. Thus, in the light most favorable to the government and deferring to the jury's right to determine the credibility of the witnesses, the evidence here was sufficient to negate appellant's

self-defense claim and establish that she was the first aggressor. *See Jones v. United States*, 67 A.3d 547, 549 (D.C. 2013). "Contradictions between the testimony from various witnesses [are] unremarkable, and in and of itself is not enough to reverse a jury verdict . . . , [and] [w]e have repeatedly held that the testimony of one witness is sufficient to sustain a conviction." *Graham v. United States*, 12 A.3d 1159, 1163 (D.C. 2011) (citations omitted). Second, even assuming that Ms. Spenard was the first aggressor by drunkenly taking a swing at appellant or pushing her, appellant's actions in knocking Ms. Spenard down and dragging her across the sidewalk and across broken glass that caused cuts throughout Ms. Spenard's body was excessive, thereby negating her self-defense claim. *See Ewell*, *supra*, 72 A.3d at 130-31 ("[I]nstances in which we have upheld determinations of excessive force as a matter of law have uniformly involved situations where the secondary, responsive aggression was completely disproportionate to the initial aggression faced." (citations, internal quotation marks, and original brackets omitted)). Accordingly, we sustain appellant's simple assault conviction.

### 3.  Leaving After Colliding

It is a crime under D.C. Code § 50-2201.05c (a)(1) for the operator of a vehicle "who knows or has reason to believe that his or her vehicle has been in a collision" to fail to "immediately stop" "where another person is injured." Appellant argues that there was insufficient evidence that she knew or should have known that she hit Mr. Tolbert as she was driving away.  On the contrary, there was abundant evidence for the jury to infer that appellant knew or at least should have known that she had hit Mr. Tolbert.  It is essentially undisputed that Mr. Tolbert came up to appellant's car as she was about to drive away to prevent her from leaving, and that to drive away appellant stepped on the gas pedal with Mr. Tolbert dangerously close to the vehicle.  In such circumstances, the jury could reasonably infer that appellant knew that she had hit Mr. Tolbert as she drove off, especially since Mr. Tolbert was left lying on the ground immediately following the collision.  Moreover, appellant's own witness, Mr. Lawrence, testified before the grand jury and revealed at trial on cross-examination that appellant told him that she might have hit Mr. Tolbert as she drove off.  *See Payne v. United States*, 516 A.2d 484, 493 (D.C. 1986) ("[C]onflicts created by a witness' recantation, like other internal inconsistencies within a witness' testimony, are factual questions for

the jury to resolve."). Accordingly, there was sufficient evidence to sustain appellant's leaving after colliding conviction.

### B. Prosecutor's Closing

Appellant takes issue with certain arguments that the prosecutor made during his closing arguments. She admits that defense counsel, however, failed to object to these arguments and that accordingly our review is for plain error only. *See Davis v. United States*, 984 A.2d 1255, 1259 (D.C. 2009) ("Under the test for plain error, appellant first must show (1) 'error,' (2) that is 'plain,' and (3) that affected her 'substantial rights' . . . [and that] (4) 'the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" (citations and internal quotation marks omitted)). We look to see if the trial court plainly erred by failing to *sua sponte* intervene during the prosecutor's closing argument. *Daniels v. United States*, 2 A.3d 250, 263 (D.C. 2010) (citation and internal quotation marks omitted). Reversal on plain error in cases of alleged improper prosecutorial comments is reserved for the most "egregious situations." *Teoume-Lessane v. United States*, 931 A.2d 478, 496 (D.C. 2007) (citations and internal quotation marks omitted). On these facts, appellant cannot show that the trial court erred, much less plainly so.

Appellant objects to the prosecutor's statements during closing arguments referencing the self-defense jury instruction that included the use of deadly force[13] and arguing that appellant could not claim that she had a right to use deadly force in self-defense on the basis that she could not reasonably believe that she was in imminent danger of death or serious bodily harm at the time she hit Mr. Tolbert with the meat clever.[14]   Appellant argues on appeal that she did not use deadly

---

[13]  The instruction states:

> A person may use a reasonable amount of force in self-defense, including, in some circumstances, deadly force. "Deadly force" is force that is likely to cause death or serious bodily harm.  A person may use deadly force in self-defense if she actually and reasonably believes at the time of the incident that she is in imminent danger of death or serious bodily harm from which she can save herself only be using deadly force against her assailant.

Criminal Jury Instructions for the District of Columbia, No. 9.501 (B) (5th ed. rev. 2013).

[14]  Specifically, the prosecutor stated the following:

> Now, let's turn to the self-defense instruction . . . . "Every person has the right to use a reasonable amount of force in self-defense if she actually believes that she is in imminent danger."  Again, I submit that running towards the source of the alleged violence . . . demonstrates a lack of actual belief that you're in danger and certainly not a reasonable belief.

> "A person may use a reasonable amount of force in self-defense, including in some circumstances deadly force.

(continued…)

force against Mr. Tolbert, so the references to the deadly force instruction prejudiced her and the trial court should have recognized that. This argument is unpersuasive because the trial court purposefully gave the self-defense instruction that included the use of deadly force and appellant does not challenge that decision on appeal.[15] Because the trial court specifically gave the instruction on deadly force to the jury, it was not improper for the prosecutor to reference that instruction during closing argument and certainly not error for the trial court to allow the argument. Moreover, the instruction was appropriate. *See, e.g.*, *Harper v. United States*, 608 A.2d 152, 155 (D.C. 1992) (instruction appropriate if there is "any evidence fairly tending to bear upon the issue . . . , however weak") (citations and internal quotation marks omitted). Even though Mr. Tolbert was not killed and did

---

(…continued)

> Deadly force is force that is likely to cause death or serious bodily harm."

> . . .

> Now, when can a person use deadly force? "A person may use deadly force in self-defense if she actually and reasonably believes at the time of the incident that she is in imminent danger of death or serious bodily harm from which she can save herself only by using deadly force against her assailant." Was she actually and reasonably in fear of death and serious bodily injury?

[15] While appellant's trial counsel did object to the trial court's decision to give the deadly force instruction, appellate counsel has not argued that issue on appeal.

not necessarily suffer "serious bodily harm" as a result of the meat cleaver attack, "deadly force" is defined as "force that is *likely* to cause death or serious bodily harm." Criminal Jury Instructions, *supra* note 13, No. 9.501 (B) (emphasis added). A slash from a meat cleaver to the head can likely cause death or serious bodily harm. Thus, the trial court did not plainly err on failing to intervene during the government's closing argument.

## III.  Conclusion

Accordingly, the judgment on appeal is hereby affirmed and remanded solely for merger.

*So ordered.*