*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-CF-157

CEPHUS HOLLIS, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED 05/03/2018
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CF3-6192-15)

(Hon. Lynn Leibovitz, Trial Judge)

(Argued May 2, 2017                              Decided May 3, 2018)

*Deborah A. Persico* for appellant.

*Valinda Jones*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney at the time the brief was filed, *Elizabeth Trosman*, *Chrisellen R. Kolb*, *Christopher Bruckmann*, and *Katherine Earnest*, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and MCLEESE, *Associate Judges*, and STEADMAN, *Senior Judge*.

STEADMAN, *Senior Judge*: A jury found appellant Cephus Hollis guilty of fifteen criminal offenses relating to his vicious conduct in two separate incidents five days apart, the first with Mr. Hampton Gathers as the victim and the second with Mr. Zhong Zu as the victim. At issue in this appeal are his two convictions

for aggravated assault causing serious bodily injury and his three convictions for unauthorized use of a vehicle during or to facilitate a crime of violence resulting in serious bodily injury (UUV/COV/SBI). Appellant challenges whether the evidence was sufficient to establish that he caused "serious bodily injury" to either of his two victims. In addition, appellant challenges whether the evidence was sufficient to establish that his unauthorized use of a vehicle occurred "during the course of or to facilitate" a crime of violence. We affirm the convictions.

## I. Facts of the Assaults

## A. The Gathers Incident

On September 7, 2014, appellant and his cousin Khyree Waters set out on foot to steal cars. Appellant told Waters to target Dodges and Chryslers because these brands were relatively easy to steal, as well as to look out for delivery people, who he said typically leave the car keys in the vehicle while making deliveries. Appellant spotted a Dodge Stratus near where they lived, punched out the ignition, and drove off in the car with his cousin to look for other opportunities.

As time passed, they spotted a Dodge Avenger that was used by Mr. Gathers, a Washington Post delivery person. Appellant hopped into the driver's

seat of the Avenger but found no keys. As Mr. Gathers was returning to his car, appellant got out of the car and accosted Mr. Gathers, demanding the keys. When Mr. Gathers refused, appellant began beating and punching Mr. Gathers until Mr. Gathers fell to the ground. Appellant's cousin came to join the fray and both men continued to kick Mr. Gathers mercilessly until he finally let go of the keys. Leaving Mr. Gathers lying on the ground, appellant drove off in Mr. Gathers' Avenger, which contained newspapers as well as a cell phone and other items belonging to Mr. Gathers. Appellant's cousin also left, driving the previously stolen Stratus. The next thing Mr. Gathers recalled was waking up in the hospital. The nature and extent of his injuries are discussed in part III(A) of this opinion.

## B. The Zu Incident

Five days later, Mr. Zu, who delivered food for a Chinese restaurant, approached appellant's dwelling with a food order. Appellant opened the door wielding a knife two or three inches in length and, without a word, began to stab Mr. Zu in the head. Appellant continued to stab Mr. Zu "many" times and, even after Mr. Zu fell and lost his glasses and perhaps dropped the keys to his car. Mr. Zu managed to briefly escape from appellant and, while yelling for help, ran to his delivery car and jumped in the driver's seat. Now holding the keys, appellant

pursued Mr. Zu, jumped into the front passenger seat and demanded that Mr. Zu exit the car, repeatedly stabbing Mr. Zu in the face. When appellant got out and walked around to the driver's side of the vehicle, Mr. Zu exited the vehicle and tried to block appellant's continued knife thrusts with his hands. Mr. Zu struggled to hold the driver's door to prevent appellant from leaving, but appellant's cousin, who had now joined the action, pushed Mr. Zu, his face and body covered with blood, to the ground as appellant drove away in the vehicle. Among Mr. Zu's belongings in the car was his wallet containing $3,400 in cash. An ambulance took Mr. Zu to a hospital. The nature and extent of his injuries are described in part III(B) of this opinion.

## II. Aggravated Assault

The evolution of the offense of assault in the District of Columbia into the current three-tier classification has been set forth in a number of our prior opinions. Briefly put, prior to 2007, only two levels of assault existed in the District of Columbia. The basic statute of simple assault, now D.C. Code § 22-404 (a)(1) (June 2017 Cum. Supp.), required no injury and was punishable by a fine of no more than $1,000 and imprisonment of no more than 180 days. The more serious aggravated assault, now D.C. Code § 22-404.01 (a) (June 2017 Cum. Supp.),

required serious bodily injury and was punishable by a fine of not more than $10,000 and imprisonment of not more than ten years.[1]  "Serious bodily injury" was not defined in the statute, leaving the courts to define the term.

These two classifications of assault proved problematic in circumstances where the injury was more than "mere 'bodily injury' [such as slapping] but less serious than 'serious bodily injury.'"  *Belt v. United States*, 149 A.3d 1048, 1054 (D.C. 2016) (brackets in original).  To fill the gap, the Council of the District of Columbia added a new category of felony assault, D.C. Code § 22-404 (a)(2), effective on April 24, 2007, that required significant bodily injury and was punishable by a fine of no more than $3,000 and imprisonment of no more than three years.  The Council defined "significant bodily injury" as an injury that "requires hospitalization or immediate medical attention."  D.C. Code § 22-404 (a)(2) (2012 Repl.).  However, the legislation adding felony assault did not amend the two existing forms of assault, but simply provided an intermediate degree of assault for circumstances that were deemed more serious than simple assault but less serious than aggravated assault.

---

[1]  Aggravated assault itself was added as a separate offense in 1994.

Over the years, this court has addressed an extended spate of sufficiency challenges resulting in an extensive exposition of the term "serious bodily injury," undefined in the statute, and of "significant bodily injury" and its definition as an injury that "requires hospitalization or immediate medical attention."

With respect to the immediate issue before us, we early on defined "serious bodily injury" as one that "involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ or mental faculty." *Nixon v. United States*, 730 A.2d 145, 149 (D.C. 1999).[2] In subsequent cases, we have emphasized the "high threshold of injury" that "the legislature intended in fashioning a crime that increases twenty-fold the maximum prison term for simple assault." *Bolanos v. United States*, 938 A.2d 672, 677 (D.C. 2007) (citing *Swinton v. United States*, 902 A.2d 772, 775 (D.C. 2006)). The evidentiary standard for aggravated assault is high and any testimony must be supported by probative evidence. *See Swinton*, 902 A.2d at 775-77; *Scott v. United States*, 954 A.2d 1037, 1046 (D.C. 2008); *In re P.F.*, 954 A.2d 949, 952 (D.C. 2008). "Serious bodily injury usually involves a life-threatening or disabling injury, but the court must

---

[2] We adopted this definition from that contained in another statute pertaining to sentencing for a sex offense, D.C. Code § 22-3001 (7) (2013 Repl.).

also consider all the consequences of the injury to determine whether the appropriate 'high threshold of injury' has been met." *Bolanos*, 938 A.2d at 678.

We now turn our attention to the details of the injuries inflicted by appellant on each victim. We do so pursuant to the oft-stated and well-established standard for such review, viewing all evidence in the light most favorable to the government and giving deference to the jury to weigh the evidence and draw all justifiable inferences of fact. *See, e.g.*, *Belt*, 149 A.3d at 1052.

### III. The Victims' Injuries

### A. Gathers

The evidence presented to the jury as to Mr. Gathers' injuries and their treatment at the hospital included testimony from the attending trauma surgeon who treated Mr. Gathers, the first officer on the scene, and Mr. Gathers.

Dr. Kakra Hughes was the attending trauma surgeon on call the night Mr. Gathers was brought in and immediately noticed Mr. Gathers' heart rate was over 100 beats per minute, which can "suggest severe pain or bleeding." Dr. Hughes also noticed "a lot" of bruising on Mr. Gathers' face, that his shoulder was "painful

and swollen," and that his left eye and pupil were "sluggish." CT scans and X-rays that Dr. Hughes ordered revealed that the bony structure surrounding Mr. Gathers' left eye was broken in multiple places, his nose, jaw, and wrist were also broken, and his shoulder was dislocated. Almost two hours after Mr. Gathers was brought to the hospital, his pain was still the maximum level on the hospital's pain scale.[3] Mr. Gathers' broken wrist required a plate and screw to set it in place, and seven to eight months to heal, which caused him to miss eight months of work. He also needed corrective surgery for his tear ducts because his tears would spill into his eyes, making it hard to see. Six months after the attack, there were still visible marks under both eyes and his left eye was still bloodshot.

In testifying, Mr. Gathers described his injuries as a dislocated shoulder, "badly bruised" eyes, a broken wrist, and damaged tear ducts, and, at the time of trial, he still struggled with remembering names and directions to places he has been before. Officer Aris Karcic, the first officer on the scene, noted that Mr. Gathers was "profusely bleeding from the face" and was "semiconscious." Officer Karcic called an ambulance to take Mr. Gathers to the hospital, where Officer Karcic observed "severe lacerations, wounds across his face, swelling."

---

[3] The hospital asks patients to rate their pain on a scale of 1 to 10, with 1 being the minimum and 10 being the maximum.

With respect to Mr. Gathers, the jury instruction defined "serious bodily injury" in terms of the last four *Nixon* factors, omitting only "serious risk of death." Here the jury heard evidence from the responding officer, who described Mr. Gathers as "in and out" of consciousness at the scene and from Mr. Gathers himself, who could remember nothing following his beating until he "woke up" in the hospital.[4] The jury heard evidence from the treating physician about Mr. Gathers' "maximum" pain level as well as the full range of his injuries, including the broken jaw and eye bones.[5] The jury saw photos of Mr. Gathers taken some six months after the attack, which showed his face was still bruised and swollen and his left eye bloodshot.[6] The jury heard that Mr. Gathers was unable to work for seven to eight months due to his wrist injury, his tear duct required surgery to fix after he was discharged from the hospital, and he had trouble with his memory

---

[4] *See, e.g.*, *Beaner v. United States*, 845 A.2d 525, 538 (D.C. 2004) (unconsciousness).

[5] *See, e.g.*, *Jenkins v. United States*, 877 A.2d 1062, 1071-72 (D.C. 2005) (extreme physical pain).

[6] *See, e.g.*, *Gathy v. United States*, 754 A.2d 912, 918-19 (D.C. 2000) (protracted and obvious disfigurement).

even up to the date of trial.[7]  Considering these and all the other circumstances of the assault and its consequences, we are quite satisfied that the jury could reasonably find that the evidence justified a finding of guilt of aggravated assault on Mr. Gathers.

Appellant does not contest this description of Mr. Gathers' injuries.  Rather, his insufficiency argument is based on the proposition that the definition of "severe bodily injury" is insufficiently demanding in light of the establishment of the intermediate level of felony assault.  He asserts that the injuries must now be "life-threatening" to justify a finding of aggravated assault.  He cites our cases such as *Quintanilla v. United States*, 62 A.3d 1261 (D.C. 2013) discussing the nature of evidence sufficient to support a finding of felony assault and argues that the injuries in our present case are closer to those standards.[8]  He correctly states that

---

[7]  *See, e.g.*, *In re D.E.*, 991 A.2d 1205, 1211 (D.C. 2010) (protracted loss or impairment of function).

[8]  Of course, the fact that injuries meet the felony assault standard does not mean that they cannot also meet the more demanding standard for aggravated assault.  In our view, the injuries suffered by Mr. Gathers taken as a whole are significantly more serious than those sustained in the cited cases dealing with felony assault.  In fact, every assault and every set of injuries will have its own characteristics, just as is the case with other crimes which result in disparate sentences.  Determining whether a particular assault is deemed felony or aggravated could well be a task left to a fully instructed jury, rather than calling for a detailed appellate parsing of numerous cases, and reversal for insufficiency

(continued…)

we have used the phrase "life-threatening" in several opinions. But we have generally done so in a qualified manner: e.g. "[T]he victim has usually sustained life-threatening or disabling injuries." *Scott*, 954 A.2d at 1046, citing *Swinton*, 902 A.2d at 775. In fact, the settled *Nixon* standard already includes the equivalent "substantial risk of death" and appellant's approach would negate the other four types of injuries that we have held sufficient to constitute aggravated assault. The legislature in establishing the new offense of felony assault was "fill[ing] the gap" and left unchanged the section on aggravated assault. *Belt*, 149 A.3d at 1054. So to speak, the enactment did not move the existing goal posts but instead inserted a new scoring opportunity at, say, the fifty-yard line. Indeed, *Scott* itself went on to say, quoting *Swinton,* that "[a]ggravated assault victims 'typically required urgent and continuing medical treatment (and, often, surgery), carried visible and long-lasting (if not permanent) scars, and suffered other consequential damage, such as significant impairment of their faculties.'" 954 A.2d at 1046. This is not an inapt description of the sufferings of Mr. Gathers from this brutal beating by appellant. It is fair to say that the jury could reasonably view this case of aggravated assault on Mr. Gathers as "in short, horrific." *Id.*

---

(…continued)
would generally occur only for a clearly outlier verdict. As we pointed out recently in *Belt*, 149 A.3d at 1056, every day juries are entrusted with deciding difficult factual issues applying their common sense.

## B. Zu

The assault on Mr. Zu somewhat differs from the assault on Mr. Gathers in that the jury was instructed on only one theory of aggravated assault, as follows: "Serious bodily injury for this offense involving [Zhong Zu] is an injury that involves extreme physical pain." The question of the sufficiency of the evidence thus rests on whether enough was presented to meet "the demanding standard we require for proof of extreme physical pain" to allow a finding of guilt on that ground. *Jackson v. United States*, 940 A.2d 981, 989 (D.C. 2008).

Unlike the other four criteria for severe bodily injury, the term "extreme physical pain" is, as we noted in *Swinton*, "regrettably . . . subjective." Nonetheless, we went on in *Swinton* to set forth an exposition of the term, saying: "[T]he adjective 'extreme' – typically defined as 'existing in the highest or the greatest possible degree' – unambiguously indicates that the level of pain must be exceptionally severe if not unbearable." 902 A.2d at 777. But, importantly, *Swinton* further observed that "even absent graphic descriptions of suffering from the victim herself or other witnesses, a reasonable juror may be able to infer that pain was extreme from the nature of the injuries and the victim's reaction to them."

*Id.*; *see also Medley v. United States*, 104 A.3d 115, 127-28 (D.C. 2014).

Dr. James Street was a trauma surgeon on call when Mr. Zu was brought to the emergency room by ambulance. He observed numerous stab wounds on Mr. Zu's forehead, face, left cheek, nose, right shoulder, left flank, and both hands. After conducting an initial trauma evaluation, Dr. Street determined that Mr. Zu was "relatively" stable. None of the wounds were "bleeding excessively" and the wounds could be controlled, followed by a cleaning and stitches to close most of them. A major concern was the proximity of one of the stab wounds in Mr. Zu's left side to "a lot of critical structures in that area, lung, heart, diaphragm, stomach, spleen." A chest X-ray showed that ten percent of Mr. Zu's lung was collapsed, and a chest tube was placed in him to relieve that condition. The next day, Mr. Zu underwent a surgical procedure in which a scope was put in his abdomen that blew up the abdomen with air and enabled the doctor to determine that the diaphragm was fortunately intact. The stab wound to Mr. Zu's nose required the expertise of an ear, nose, and throat doctor to repair it. Following his discharge after three days, Mr. Zu was scheduled to return to the hospital one week later to have the stitches removed. He remained at home a month to rest and recover from the incident.

A direct report of pain in the record was a medical record dated the day of the assault. As explained by Dr. Street, the hospital practice was to ask a patient as to his or her level of pain on a scale of 1 to 10, in which "[t]en is supposed to represent the most excruciating pain one could ever imagine." The record contained a nurse's notations that early on, Mr. Zu's self-reported a maximum pain level of 10, which, upon his receiving pain medication, alleviated to somewhat lower levels. Although Dr. Street did not testify about any specific behavioral manifestation of such pain, he did describe in detail the subsequent medical and surgical procedures that the wounds necessitated. Mr. Zu himself, testifying through an interpreter, described in vivid terms the whole unprovoked and vicious stabbing attack with its multiple and recurring stab wounds and its aftermath in the hospital, although he did not volunteer information about his pain nor was he asked about it. Other witnesses to the scene described Mr. Zu as screaming for help and lying on the ground covered with blood still coming out from him. And the jury was shown a series of photographs depicting Mr. Zu's wounds in detail.

Appellant in his reply brief explicitly states that he does not dispute that "Zu suffered extreme physical pain." Rather, he rests his case for reversal on the same argument he made with respect to Mr. Gathers, namely, that the injuries must be

"life-threatening" to warrant a finding of aggravated assault.[9] In the previous subsection of this opinion, we have addressed and rejected this argument and the same rejection of course applies here. In a number of prior cases, we have sustained convictions for aggravated assault involving severe physical pain.[10] Given appellant's concession and the full record here, we do so again in sustaining the conviction for aggravated assault on Mr. Zu.

## IV.  The Enhanced Sentence

Under D.C. law, the authorized sentence for committing the basic crime of unauthorized use of a vehicle is imprisonment up to five years. D.C. Code § 22-3215 (d)(1) (June 2017 Cum. Supp.). If the defendant "took, used, or operated" the vehicle "during the course of or to facilitate a crime of violence," the sentence is up to ten years, and if serious bodily injury results, the potential sentence increases by another five years. D.C. Code § 22-3215 (d)(2)(A) (June 2017 Cum. Supp.). A "crime of violence" is defined by cross-reference to D.C. Code § 23-1331 (4) (June

---

[9] In fact, it is not readily apparent that Mr. Zu's wounds would not meet that standard. As described, the knife thrust in the left flank came perilously close to vital organs. *Cf. Cheeks v. United States*, 168 A.3d 691, 697-98 (D.C. 2017).

[10] *See, e.g.*, *Jenkins v. United States*, 877 A.2d 1062, 1070-72 (D.C. 2005) (multiple stab wounds). *See also Jackson v. United States*, 940 A.2d 981, 989-90 (D.C. 2008) (listing a series of cases) and note 8, *supra*.

2017 Cum. Supp.). D.C. Code § 22-3215 (d)(2)(B) (2012 Repl. & June 2017 Cum. Supp.) That subsection lists, among other offenses, aggravated assault, assault with significant bodily injury, robbery, and carjacking, all of which crimes appellant was convicted of committing against Mr. Gathers and all of which were included in the charge to the jury on this offense.

Appellant challenges his two convictions of UUV/COV/SBI involving the use of the Dodge Stratus (the first stolen car) and the Dodge Avenger (Gathers' car). He argues that the evidence was insufficient to show that he used either car "during the course of or to facilitate" a crime of violence. We have little difficulty in rejecting this assertion. As the government rightly argues, the stolen Dodge Stratus provided the means by which appellant could scour the neighborhood and brought him to the location where the assault on Mr. Gathers and the robbery of his car could occur. And in stealing Mr. Gathers' car as the mechanism for fleeing the scene of the assault, he also stole the contents of that car, including the identification and cellphone.

To counter this analysis, appellant would have us read into the statute an intent element; that is, that the statute must be construed as requiring that the defendant "took, used, or operated" the vehicle with the intent or purpose of

making it easier to commit a crime of violence.[11]  We see no basis for doing so. He asserts that upon stealing the Dodge Stratus and looking for other cars to steal, he had no intention of committing a serious assault in the process.  "[I]n examining the statutory language, it is axiomatic that the words of the statute should be construed according to their ordinary sense and with the meaning commonly attributed to them."  *Peoples Drug Stores v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983) (en banc) (internal quotation marks omitted).  Here, we construe the word "facilitate" in its normal everyday meaning to "make easier or less difficult."  Webster's Third New International Dictionary 812 (2002); *see also, e.g.*, American Heritage Dictionary of the English Language 653 (3d ed. 1992) (defining and giving an example of facilitate as "to make easy or easier:  *political agreements that facilitated troop withdrawals*").  Whatever appellant intended or could foresee as a likely possibility at the time of stealing the Stratus, the fact of the matter is that its use could be seen to have facilitated his commission of the eventual offense.  By means of the car, appellant was able to scout out and arrive at Mr. Gathers' location.  Moreover, UUV is a continuing offense.  Even to the extent that some intent may be relevant, a reasonable inference can be made that, at the point of arrival, appellant was prepared to do whatever necessary to take

---

[11]  Appellant focuses on the word "to" preceding "facilitate," reading it as the equivalent of "in order to."  But the statute employs not only the word "took" but also "use or operate," which reflect no element of intent.

possession of Mr. Gathers' car. Furthermore, his co-conspirator cousin used the Stratus to return quickly to the scene of the assault to aid appellant in forcing Mr. Gathers to give up the car keys and in this way the car was actually used "in the course of" the assault.[12]

Appellant also presents what he might term the tautology of treating his carjacking Mr. Gathers' Avenger as the requisite "crime of violence." Such an analysis, he implies, would make every carjacking an offense subject to enhancement. This might be an objectionable feature if the government were to rely solely on carjacking as the crime of violence. But, as indicated, it does not. The crime of violence can be both the assault itself, where use of the Avenger made possible his fleeing the scene of the crime to avoid detection, and the actual robbery of at least the contents of the car.[13] In short, in any common-sense view, both cars were part and parcel of the full story of the event involving Mr. Gathers.

---

[12] Appellant cites federal cases interpreting a statute involving "in furtherance of." We do not find these cases helpful, as we view that phrase as more restrictive than "facilitate" in our statute.

[13] Robbery requires asportation or the carrying away of another's property, *Lattimore v. United States*, 684 A.2d 357, 359 (D.C. 1996), and is not a lesser-included offense of carjacking. *See Pixley v. United States*, 692 A.2d 438, 440 (D.C. 1997).

## V. Conclusion

In the event of affirmance, appellant and the government are in agreement that the two convictions for felony assault merge into the two respective convictions for aggravated assault and are therefore vacated. In all other respects, the convictions appealed from are affirmed.

*So ordered.*