*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 17-CF-530

DOMINIC A. WHITE, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF3-3070-15)

(Hon. Juliet J. McKenna, Trial Judge)

(Argued February 27, 2019                    Decided May 9, 2019)

*Nancy E. Allen* for appellant.

*Daniel J. Lenerz*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney, and *Elizabeth Trosman*, *John P. Mannarino*, and *Monica Trigoso*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and FISHER and BECKWITH, *Associate Judges*.

FISHER, *Associate Judge*: Appellant Dominic A. White challenges the sufficiency of the evidence to support his convictions for insurance fraud, conspiracy, and aggravated assault while armed ("AAWA"). He also argues that the trial judge committed reversible error in responding to a question from the jury. Once again, this court must grapple with the question of what constitutes a "serious

bodily injury," an element of proof required to convict a defendant of AAWA. We affirm in part, reverse in part, and remand for resentencing.

## I. Background

## A. The Insurance Scheme

Phanessa Haynes filed a claim with State Farm Insurance on October 15, 2014, reporting that somebody had stolen the rims and tires from her Volkswagen Passat. She included a photograph of her car and two receipts totaling $5,342.04, purportedly documenting her purchase of those rims and tires. Haynes declined State Farm's offer to replace the missing items, instead insisting that the insurance company reimburse her. Haynes hired WTF Towing to take her Volkswagen to a lot, and State Farm provided her with a temporary rental car.

State Farm's fraud investigation unit began reviewing Haynes's claim on October 20. Many warning signs of fraud emerged, according to Laura Gladding, the company's claims specialist who reviewed the matter. These included the recent purchase of the policy, the customer's eagerness to settle the claim, and a discrepancy between the addresses on the tire merchant's website and the receipts.

Additionally, the insurance company obtained the police report filed by Haynes, in which she estimated the value of the stolen items as only about $1,400.

Gladding conducted two phone interviews on October 27: one with Haynes and another with a person whom Haynes said was her brother "Dominic." The man on the latter call, who used appellant's phone number, identified himself to Gladding as "Damon Whittaker." This man reported that the missing rims and tires had been installed by somebody named "Jay" rather than a person nicknamed "D. Money," as Haynes had stated. Gladding asked him for the contact information for "Jay" but never received it. During a call on October 30, Gladding told Haynes that State Farm would not process her claim unless she spoke under oath with a company attorney. Gladding added that the company would only pay for the car's storage at the towing lot for a few more days.

## B. The Attack at the Towing Lot

Haynes arrived at WTF Towing's lot to pick up her car at about 5:00 p.m. on November 4 and saw Philip Lovell installing tires and rims on her Volkswagen. Haynes expressed her anger with Lovell about a scratch on the car as well as the "raggedy rims" that he had installed. Soon, a quarrel erupted and both parties

exchanged derogatory words. Haynes, who was holding a cell phone on speakerphone, said into the phone, "I'm here now." Haynes then told Lovell, "You gonna make me call my boyfriend on you." After she demanded that Lovell "hurry up" with the installation, he responded, "Why don't you call your punk boyfriend and . . . tell him to come fix it." Haynes said to somebody on her phone that "[t]hey're playing games with me" and that "he called you out."

Eventually, Lovell walked away from Haynes and toward the area where tires were stored. Moments later, appellant arrived at the towing lot. Haynes pointed to Lovell and told appellant, "That's him." Next, an onlooker screamed, "Watch out!" and Lovell turned around to see appellant swinging a metal pole at his head. The pole — an aluminum handle used to operate a car jack — struck the head of Lovell, who fell to the ground and covered his head and face. The assailant then struck Lovell a second time, this time on the back of his head. One witness, Deneil Bettis, remembered Lovell screaming, "He's trying to kill me!" Bettis and another bystander approached appellant with pocketknives, prompting White to flee the towing lot in his car. Witnesses and police officers who arrived described Lovell as "disoriented," "crying hard," and unable to stand up without help. One police officer recalled that Lovell "appeared to be in a lot of pain" because "there was a lot of blood."

Lovell remained conscious and recalled that he did not feel any pain at the time due to the effects of adrenalin. An ambulance arrived, but he repeatedly resisted going to the hospital due to perceived costs. A co-worker and a police officer eventually convinced Lovell to get in the ambulance despite his concern about medical bills. Lovell then momentarily left the ambulance to lock his vehicle before going to the hospital.

When a bloodied Lovell arrived at Howard University Hospital's emergency room, he reported his pain level as a "ten," the maximum level. Hospital staff performed a CT scan of his head, which showed no acute brain injuries. Dr. Adrienne Wilson, who treated Lovell, said that he had suffered two "superficial" scalp lacerations that measured roughly four centimeters in length, one each on the front and back of his head. According to Dr. Wilson, Lovell was not actively bleeding and did not experience vomiting or nausea. Lovell was given Tylenol No. 3, which contains codeine, to help with his pain. After the physicians cleaned Lovell's two head wounds, they closed the lacerations with eighteen staples. The hospital discharged Lovell the same night at 12:50 a.m., roughly six hours and forty minutes after he entered the emergency room. Dr. Wilson wrote Lovell a prescription for ten tablets of Tylenol No. 3 and twenty tablets of Motrin.

For a month or two after being released, Lovell suffered daily migraines. He also experienced occasional nausea and sometimes vomited. Lovell returned to work within a week of the attack but incurred a migraine while driving a tow truck and was assigned to office work for about a month. His primary care physician referred him to Dr. Jenny Lin, a neurologist, who examined him about three-and-a-half months after the attack. Lovell told Dr. Lin that he had experienced some light-headedness and a "persistence of daily headache," which he described as "throbbing pain." He reported that he was taking ibuprofen, which did not adequately alleviate his head pain. Lovell performed well on all the tests administered by Dr. Lin, who determined that Lovell "possibly" suffered from "posttraumatic headache." She recommended that he receive a brain MRI and return for a follow-up evaluation, but there is no evidence that he did either. To help Lovell with his headaches, Dr. Lin prescribed an antidepressant for "chronic headache" but no other medications. At the time of the trial more than two years after the attack, Lovell estimated that he suffered migraines about once every two months.

**C. The Proceedings**

Haynes was charged with insurance fraud, conspiracy to commit insurance fraud, and solicitation of a violent crime. A jury convicted her of the two insurance-related charges only, and she did not appeal. White was charged with insurance fraud, conspiracy to commit insurance fraud, aggravated assault while armed with "a pole," assault with a dangerous weapon ("that is, a pole"), and possession of a prohibited weapon ("a pole"). A jury convicted him on all five counts. The trial court sentenced appellant to one year of incarceration for each of the two insurance charges, to run concurrently; eight years' incarceration for AAWA and four years' incarceration for assault with a dangerous weapon ("ADW"), to run concurrently to each other and consecutive to the insurance counts; and one year of incarceration for possession of a prohibited weapon, to run concurrently.

## II. Analysis

### A. Did the Trial Judge Erroneously Instruct the Jury?

Appellant first contends that the trial judge improperly responded to a note sent by the jury during deliberations. We review the trial judge's answer to the jury for abuse of discretion. *See Cheeks v. United States*, 168 A.3d 691, 698 (D.C.

2017). "When a jury makes explicit its difficulties[,] a trial judge should clear them away with concrete accuracy." *Id.* (alteration in original) (quoting *Bollenbach v. United States*, 326 U.S. 607, 612–13 (1946)). We hold that the trial court did not err.

Regarding the counts of ADW, *see* D.C. Code § 22-402 (2013 Supp.), and possession of a prohibited weapon, *see id.* § 22-4514(b), the jury first asked if it must find that the weapon used was a pole.[1] The trial judge, the Honorable Juliet J. McKenna, responded that "the dangerous weapon must be a pole" since the indictment specified that the weapon was "a pole." A few hours later, the jury sent another note to ask whether the pole used in the attack must be the pole in evidence. White's trial counsel urged Judge McKenna to respond affirmatively. Judge McKenna declined, saying that she would answer, "No, the jury must find

[1] For these two counts as well as the AAWA charge, the indictment identified the weapon as a pole. The AAWA jury instruction explicitly stated that the government was required to prove that the defendant was armed with "a dangerous weapon, that is, a pole." However, the jury instructions for ADW and possession of a prohibited weapon, which were derived from model instructions, omitted any reference to the pole. For ADW, the government must prove that the defendant committed the act "with a dangerous weapon," which is defined as any object "designed to be used, actually used, or threatened to be used[] in a manner likely to produce death or serious bodily injury." *See* Criminal Jury Instructions for the District of Columbia No. 4.101 (5th ed. rev. 2016). For possession of a prohibited weapon, the trial judge said the government must prove that the defendant "possessed a dangerous weapon" and "intended to use it unlawfully against another." *See id.*, No. 6.503.

beyond a reasonable doubt that the object was a pole and that the pole was a dangerous weapon."

Whether the pole in evidence was the exact weapon used by appellant is not beyond question.[2]  Deneil Bettis recalled that White dropped the pole that he used after hitting Lovell.  Two laborers on the site later picked up the object and used it along with a jack to work on a car.  Many of these poles, described as about two feet long and one inch thick, routinely rested on the ground at the towing lot.

When Bettis testified, he referred to a photograph of a pole found on the site to explain how the instrument worked.  On cross-examination, Bettis acknowledged that he did not know if the pole in evidence was the same weapon but observed that it "look[ed] like the one."  The crime scene technician said that he could not find any fingerprints on the pole in evidence because of its porous surface.

---

[2]  In closing argument, government counsel alternated between referring to "a" pole and "this" pole.  At one point, she said:  "Ladies and gentlemen, when you take this metal pole and strike it twice on someone's head, you have to know that it could cause serious bodily injury."

Appellant's argument, which relies on only one case, is not persuasive. His brief cites *Williamson v. United States*, 445 A.2d 975, 980 (D.C. 1982), which discussed whether a jury could conclude that an umbrella with a pipe attachment was a dangerous weapon, but there was no dispute in that case about whether the item in evidence was the umbrella in question. Just as the government may prove that an object is a dangerous weapon without presenting it in court, it can present to the jury for illustrative purposes a pole with the same characteristics that might not have been the exact weapon. *See Kidd v. United States*, 940 A.2d 118, 129 (D.C. 2007) (gun recovered from defendant's residence properly admitted even if it was not conclusively connected to the murder). The failure to identify the weapon "precisely affect[s] only its evidentiary weight, not its admissibility." *Nelson v. United States*, 601 A.2d 582, 597 (D.C. 1991); *see also Hammond v. United States*, 77 A.3d 964, 970 (D.C. 2013) (failure to establish a chain of custody "goes to its weight and not its admissibility"). Thus, the trial judge accurately instructed that the government did not have the additional burden to prove that the pole in evidence was the exact object used in the attack.

## B. Was There Sufficient Evidence of Insurance Fraud?

Appellant asserts that the government presented insufficient evidence to convict him of either first-degree insurance fraud[3] or conspiracy to commit that offense.[4] When considering the sufficiency of evidence, we "view the evidence in the light most favorable to the government, giving full play to the right of the fact-finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence." *Cherry v. District of Columbia*, 164 A.3d 922, 929 (D.C. 2017) (quoting *Brooks v. United States*, 130 A.3d 952, 955 (D.C. 2016)). "The evidence is sufficient if 'any rational fact-finder could have found the elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Hernandez v. United States*, 129 A.3d 914, 918 (D.C. 2016)).

---

[3] D.C. Code § 22-3225.02 (2012 Repl.). Both appellant and Haynes were charged with "presenting false information or knowingly concealing information regarding a material fact in a claim for payment or benefit pursuant to an insurance policy or reinsurance contract."

[4] D.C. Code § 22-1805a (2013 Supp.). The three elements of conspiracy are "an agreement between two or more persons to commit a criminal offense," "knowing participation in that agreement with intent to commit the criminal objective," and "during the life of the conspiracy, and in furtherance of its objective, the commission by at least one conspirator of at least one of the overt acts specified in the indictment." *Harrison v. United States*, 76 A.3d 826, 842 (D.C. 2013) (quoting *Castillo-Campos v. United States*, 987 A.2d 476, 482 (D.C. 2010)).

Appellant acknowledges there was "overwhelming evidence" of co-defendant Haynes's guilt but argues that he was an "unwitting sidekick." But a rational fact-finder could have found otherwise. For instance, text messages and emails between the two defendants provided sufficient evidence from which a juror could have justifiably inferred appellant's culpability. On the night of October 13, four days before Haynes submitted a doctored receipt to State Farm, appellant texted her that he planned to "get on the computer and put these receipts together." About two hours later appellant texted Haynes, "The one on the right is the one I fixed up," attaching an image of two receipts that was presented at trial. The jury heard other evidence of appellant's participation in the scheme, including Laura Gladding's call with a man using appellant's phone number. With the evidence viewed in the light most favorable to the government, this claim is without merit.

## C. Was There Sufficient Evidence of AAWA?

Appellant also argues that the government presented insufficient evidence to convict him of AAWA. We agree.

By statute, three tiers of assault exist in the District of Columbia. A conviction for simple assault, which may, but need not, cause injury, carries a maximum sentence of 180 days. D.C. Code § 22-404(a)(1) (2013 Supp.). On the other end of the spectrum, a conviction for aggravated assault can result in a sentence of ten years. *Id.* at § 22-404.01. In 2006 the Council of the District of Columbia added a middle category for an assault causing "significant bodily injury" ("ASBI"), which carries a maximum three-year sentence. *Id.* at § 22-404(a)(2); Omnibus Public Safety Amendment Act, 2006 D.C. Sess. Law Serv. 16–306 (West). Additionally, a defendant convicted of committing a crime of violence, including aggravated assault and ASBI, while armed faces an enhancement of these maximum sentences to thirty years. *See* D.C. Code § 22-4502 (2013 Supp.); *id.* § 23-1331(4) (defining "crime of violence").

By creating an intermediate felony assault offense, the Council intended to "fill the gap between aggravated assault and simple assault," covering assaults that resulted in "significant (but not grave) bodily injury." *Perry v. United States*, 36 A.3d 799, 816 n.30 (D.C. 2011) (quoting D.C. Council, Report on Bill 16–247 at 5–6 (Apr. 28, 2006)). The statute defines "significant bodily injury" as "an injury that requires hospitalization or immediate medical attention." D.C. Code

§ 22-404(a)(2). By contrast, an aggravated assault must meet the higher bar of "serious bodily injury." *Id.* at § 22-404.01(a)(1).

Two decades ago, this court defined "serious bodily injury" as "bodily injury that involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ or mental faculty." *Nixon v. United States*, 730 A.2d 145, 149 (D.C. 1999). In the intervening years, we have had several occasions to apply the "serious bodily injury" standard. The court has often noted the "high threshold of injury" envisioned by the legislature in authorizing a maximum prison sentence for aggravated assault that is roughly twenty times as long as that for simple assault. *See, e.g.*, *Hollis v. United States*, 183 A.3d 737, 741 (D.C. 2018). The assaults that meet this threshold often result in "life-threatening or disabling" injuries, including stab wounds, intense burns, and broken bones, *see Swinton v. United States*, 902 A.2d 772, 775 (D.C. 2006) (citations omitted) — although the *Nixon* standard certainly does not require a risk of death, *see Hollis*, 183 A.3d at 742–43. "The victims typically required urgent and continuing medical treatment (and, often, surgery), carried visible and long-lasting (if not permanent) scars, and suffered other consequential damage, such as significant impairment of their faculties." *Swinton*, 902 A.2d at 775.

Appellant argues that the government failed to prove that Lovell suffered extreme physical pain. This level of pain must be "exceptionally severe if not unbearable," which a juror can infer "from the nature of the injuries and the victim's reaction to them." *Hollis*, 183 A.3d at 743 (quoting *Swinton*, 902 A.2d at 777). We agree that the government did not meet its evidentiary burden here. While acknowledging that Lovell "experienced a frightening and painful unprovoked attack," *In re P.F.*, 954 A.2d 949, 953 (D.C. 2008) — and that the victim's injuries might have been much worse without the intervention of bystanders or modern medical care — we hold that the record does not establish that Mr. Lovell suffered extreme physical pain.

One case to which these facts are analogous is *Jackson v. United States*, 940 A.2d 981, 984 (D.C. 2008), in which a person was beaten with a hammer. The victim suffered five lacerations, all between two and four centimeters long, as well as substantial bruising on her face. *See id.* She was able to walk three blocks to call for help and was alert upon arriving at the hospital. *See id.* A CT scan revealed no broken bones, and she received fourteen stitches to her ear as well as some to other body parts. *See id.* The victim was released from the hospital with a prescription for Tylenol No. 3 to help with her self-described "sharp pains." *See*

*id.* at 984–85. Given those facts, the court held that such a level of pain did not meet the standard of "exceptionally severe if not unbearable" and vacated the appellant's AAWA conviction. *Id.* at 991.

At oral argument, government counsel argued that Lovell's pain "far exceeds what this court found sufficient" in *Jenkins v. United States*, 877 A.2d 1062 (D.C. 2005), and *Bolanos v. United States*, 938 A.2d 672 (D.C. 2007). We disagree. The victim in *Jenkins* — who had suffered stab wounds to his chest, abdomen, and arm — appeared to be in "a great deal of pain," according to a police officer. *See* 877 A.2d at 1064–65. Almost the entire blade of a seven-to-eight-inch knife had punctured his stomach, leaving his shirt covered in blood. *See id.* at 1071. Upon arriving at the hospital, the patient complained of pain near the three areas where he had been stabbed. *See id.* He underwent emergency exploratory surgery and endured five days of hospitalization before he could move his arm without difficulty. Upon discharge the physicians prescribed pain medication and told him to avoid strenuous activity and heavy lifting. *See id.*

In *Bolanos*, one of three stabbing victims testified that he thought he "was going to die."[5] *See* 938 A.2d at 682. He told a police officer at the scene that he was in pain and unable to breathe. *See id.* After he arrived at the hospital, the victim complained of shortness of breath due to pain. *See id.* Medical staff inserted a tube in his chest, and the patient remained at the hospital for forty-eight hours. *See id.* at 680 & n.10. Physicians gave him pain medication during his hospital stay and, upon discharge, prescribed Percocet and told him not to engage in heavy lifting. *See id.* at 680, 682. "Under these circumstances," we concluded, "a jury could reasonably infer that Mejia suffered 'extreme physical pain.'" *Id*. at 682. Neither *Bolanos* nor *Jenkins* compels affirmance.

In Lovell's case, he more than once resisted going to the hospital and, after getting in an ambulance, was able to walk away to lock his car. In determining that a victim did not suffer extreme physical pain, this court has "relied heavily" on the ability of a victim to walk away with or without assistance. *See Jackson*, 940 A.2d at 991 (victim walked three blocks and called 911 from a pay phone); *see also In re P.F.*, 954 A.2d at 952 (victim walked to her car with a police officer and

---

[5] This description refers to the injuries suffered by Jose Mejia, whose assailant's AAWA conviction was affirmed. The court in *Bolanos* reversed AAWA convictions related to attacks on two other individuals. *See* 938 A.2d at 681–82.

did not seek immediate medical attention). In *Jackson*, the victim did not suffer any broken bones, internal bleeding, or deep wounds. *See* 940 A.2d at 984; *see also Bolanos*, 938 A.2d at 679–80 (holding that one stabbing victim did not suffer extreme physical pain when he only required stitches for superficial wounds and was dismissed from the hospital in less than eighteen hours). Although Lovell was initially disoriented, the nature of his injuries did not require him to stay overnight in the hospital, receive surgery, or adhere to post-release restrictions.

Moreover, pain that allows victims to "pursue[] their normal lives" does not rise to the standard of "extreme." *Alfaro v. United States*, 859 A.2d 149, 161 & n.13 (D.C. 2004). We held that even "vicious whippings to naked children" with a telephone cord did not meet this threshold when the children were able to fall asleep after the beatings. *See id.* Nor does having difficulty with "everyday tasks such as taking care of [one's] children, driving [one's] car, and getting around" alone demonstrate extreme pain. *See In re P.F.*, 954 A.2d at 951, 953. Lovell returned to work within a week of the attack and, even though he felt sick the first time he operated a tow truck, he continued working at his job without apparent issue. Lovell's subjective rating that he experienced the highest pain on a ten-point scale is relevant but not dispositive. *See Earl v. United States*, 932 A.2d 1122,

1132 (D.C. 2007) (holding that the facts did not allow a jury to infer that a victim's pain was "extreme" even though she characterized her level of pain as "severe").

Appellant also disputes that Lovell suffered a "protracted loss or impairment of the function of a bodily member, organ or mental faculty." Lovell's migraines could fit the definition of "protracted," which "conveys a sense of prolongation beyond a short recovery period." *Swinton*, 902 A.2d at 777 (citing *Webster's Third New International Dictionary* 1826 (1993)). However, contrary to the government's position, there is not sufficient evidence to show that the attack caused "impairment" to the functioning of Lovell's brain. More than three months after the attack, Lovell's neurologist evaluated "his mental status, his speech, his cranial nerve, his sensory and motor function [and] his balance." After Lovell "did well" on those tests, the neurologist pronounced his exam "all normal" and prescribed only an antidepressant. Furthermore, Lovell never discussed whether or how the migraines affected his thinking, speaking, or ability to concentrate, nor did a medical expert make any claim that his migraines impaired his brain function. Lovell said the headaches caused him to vomit "sometimes," without saying more.[6]

---

[6] The government urges us to incorporate case law from other jurisdictions that migraines constitute a protracted loss to a brain's function. Perhaps some (continued…)

Lovell unquestionably suffered a severe beating and experienced pain and discomfort immediately after the attack and in the weeks following it — but the record is insufficient to demonstrate that he suffered serious bodily injury under the standards established in our case law.

## D. Was There Sufficient Evidence for an ASBI Conviction?

Although we reverse appellant's conviction for AAWA, the evidence was sufficient to support a conviction of the lesser-included offense of ASBI while armed.[7] A bodily injury is "significant" for the purpose of ASBI if it "requires hospitalization or immediate medical attention." D.C. Code § 22-404(a)(2). To conclude that a significant bodily injury occurred, "the nature of the injury itself

---

(…continued)

migraines could meet this standard, but the precedents cited are not persuasive authority given the facts of this case. *See, e.g.*, *State v. Epps*, 313 N.W.2d 553, 557 (Iowa 1981) (discussing a victim who suffered migraines after being shot in the face and temporarily knocked unconscious).

[7] "It is well-established that this court 'may direct [or allow] the entry of judgment for a lesser included offense when a conviction for a greater offense is reversed on grounds that affect only the greater offense.'" *Long v. United States*, 156 A.3d 698, 715 (D.C. 2017) (alteration in original) (quoting *Robinson v. United States*, 100 A.3d 95, 110–11 (D.C. 2014)). Appellant does not challenge that ASBI is a lesser-included offense of AAWA. *See Medley v. United States*, 104 A.3d 115, 132 (D.C. 2014) (citing *Collins v. United States*, 73 A.3d 974, 985 (D.C. 2013)).

must, in the ordinary course of events, give rise to a 'practical need' for immediate medical attention beyond what a layperson can personally administer, either *to prevent long-term physical damage* or to abate severe pain." *Belt v. United States*, 149 A.3d 1048, 1055 (D.C. 2016) (emphasis added) (citation omitted). Such immediate medical attention is "required" if the "medical treatment can only be prescribed or administered by trained medical professionals, such as with stitches." *Id.* By contrast, an injury is not considered significant under the statute if it can be treated merely with "everyday remedies such as ice packs, bandages, and self-administered over-the-counter medications." *Quintanilla v. United States*, 62 A.3d 1261, 1265 (D.C. 2013) (discussing injuries that consisted of bruises to the victim's leg, head soreness, partial swelling of her face, and swollen fingers). Nor is there sufficient evidence for an ASBI conviction if a victim's hospital visit is optional or not immediately necessary. *See Teneyck v. United States*, 112 A.3d 906, 910 (D.C. 2015).

In *Nero v. United States*, 73 A.3d 153, 158–59 (D.C. 2013), we assessed the injuries to two gunshot victims and explained why only one was "significant." A physician testified that the bullet wound through the bicep of one victim could have been life-threatening and that there likely would have been a higher chance of infection had he not received medical treatment. *See id.* at 158. "To ward off

these risks," physicians gave the patient antibiotics, wound care, and medication to abate "obvious pain," and we held the evidence was sufficient to prove that a significant bodily injury had been inflicted. *See id.* By contrast, the other victim "did not even realize that he had been injured until a paramedic had him remove his jacket," and it was not clear from the record "whether the bullet actually penetrated his skin or merely grazed it." *See id.* at 159. The treating physician said "probably not much" would have happened without professional medical treatment, and we held that the evidence was insufficient to prove that this victim had suffered a significant bodily injury. *See id.*

To determine whether treatment is "medical," we ask whether the attention required by this type of injury is "aimed at preventing long-term physical damage and other potentially permanent injuries" or abating severe pain. *Quintanilla*, 62 A.3d at 1265 (internal quotation marks omitted). This is an objective test which focuses on the nature of the victim's injuries. *See id.* at 1264. In *Quintanilla*, EMTs on the scene took pictures of the victim and checked her for both a concussion (she was "fine") and a broken finger ("[I]t probably wasn't."). *See id.* at 1263. We stated that she did not need medical attention (as contemplated by the definition of "significant bodily injury") because the treatment required was akin to "mere diagnosis." *Id.* at 1264–65.

When assessing the need for medical treatment, we have recognized that "not every blow to the head in the course of an assault necessarily constitutes significant bodily injury." *Blair v. United States*, 114 A.3d 960, 980 (D.C. 2015) (citing *Quintanilla*, 62 A.3d at 1262). But we held that a reasonable jury could conclude that a significant bodily injury occurred when "the defendant repeatedly struck the victim's head, *requiring testing or monitoring to diagnose possible internal head injuries*, and also caused injuries all over the victim's body." *Id.* (emphasis added). The assailant in that case had "kept banging [the victim's] head against the ground," and the treating physician ordered a CT scan of her head after being "concerned" about a "significant head injury." *See id.* at 979. This court also held that sufficient proof of a significant bodily injury existed when a victim suffered a "prolonged beating that included repeated blows to his head"; the physician ordered CT scans in order to determine whether he had sustained brain damage or other internal injuries. *See Cheeks*, 168 A.3d at 698. An injury that "poses a manifest risk" of long-term physical damage or severe pain may require diagnostic testing "to evaluate the danger and need for treatment," so it is still considered a significant injury whether or not the test results indicate the need for further professional medical treatment. *See id.* at 697–98.

Here, Dr. Wilson testified that a CT scan of Lovell's head was ordered to "assess his skull and brain for any signs of internal injury," such as a fracture or intracranial bleeding. Medical professionals cleaned the lacerations to Lovell's head, injected the wounded areas with an anesthetic, and used eighteen staples to close the cuts. Dr. Wilson testified that the type of injuries suffered by Lovell presented the risk of future infection, poor healing, and re-bleeding. "The best medical care" for his injuries, according to Dr. Wilson, was to have the wounds closed within twenty-four hours of the attack, after which the chance of infection would have increased. There would have been a "[h]ighly unlikely but possible" chance of death, she testified, if Lovell's scalp wounds had become infected and those infections had spread to his brain.

Based on our case law, a jury reasonably could conclude that Lovell's injuries required immediate medical attention to prevent long-term physical damage or other potentially permanent injuries to his head. As in *Nero*, a physician testified that the types of wounds would have carried a higher risk of infection had the patient not received prompt medical attention. Unlike in *Teneyck*, medical testimony emphasized the importance of treatment within twenty-four hours of the injury. The treatment for the type of lacerations incurred by Lovell, including staples and wound-cleaning, and a CT scan to test for brain

injuries, required the skill of trained medical professionals. The medical attention needed for this type of injury was similar to that in cases like *Belt* and *Cheeks* rather than the "mere diagnosis" and minor remedies in *Quintanilla*. Therefore, appellant's sufficiency challenge to an ASBI while armed conviction lacks merit.

### III. Conclusion

For the foregoing reasons, we vacate appellant's conviction of AAWA but direct the entry of judgment for the lesser-included offense of ASBI while armed. We also affirm appellant's convictions for insurance fraud, conspiracy, ADW, and possession of a prohibited weapon. However, ADW is a lesser-included offense of ASBI while armed, *see Cheeks*, 168 A.3d at 695 & n.9, so one of those convictions must be vacated. Since the trial judge imposed a longer, but concurrent, sentence for AAWA than ADW, we remand for resentencing. *See Herring v. United States*, 169 A.3d 354, 360–61 (D.C. 2017) (discussing the sentencing court's ability to reallocate the punishment after some but not all convictions have been vacated).

*So ordered.*