*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-482

JUSTIN HEADSPETH, APPELLANT

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-1887-16)

(Hon. Todd E. Edelman, Trial Judge)

(Submitted June 3, 2021                    Decided December 8, 2022)

*Nancy Allen* was on the brief for appellant.

*Channing Phillips*, Acting United States Attorney (at the time of submission), and *Elizabeth Trosman*, *John P. Mannarino*, *Laura R. Bach*, *Ellen D'Angelo*, and *Anne Y. Park*, Assistant United States Attorneys, were on the brief for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, BECKWITH & EASTERLY, *Associate Judges*.

BLACKBURNE-RIGSBY, *Chief Judge*: Appellant Justin Headspeth was indicted on seventeen assault and gun possession charges related to his shooting of Otis Grandson and Eugenia Young in the Parkchester community in the southeast

quadrant of Washington, D.C. Following a trial, the jury found appellant guilty of thirteen of those counts. Specifically, the jury found appellant guilty of one count of assault with the intent to kill while armed ("AWIKWA"), one count of aggravated assault while armed ("AAWA"), one count of assault with significant bodily injury while armed ("ASBIWA"), and three related counts of possession of a firearm during the commission of a crime of violence or a dangerous offense ("PFCV") as to Otis Grandson. The jury also convicted appellant of the same as it relates to Eugenia Young, as well as one additional count of unlawful possession of a firearm ("UPF"). Appellant challenges his conviction of AAWA against Mr. Grandson, claiming there is insufficient evidence to support his conviction, and also challenges the trial court's denial of his motion for a mistrial based on alleged jury misconduct. Appellant also argues for merger of certain convictions. We affirm, and remand on the merger issue, which the government concedes.

## I.      Factual and Procedural History

Appellant (also known as Goobs[1]) and Mr. Grandson have known each other for several years, previously as neighbors in the Parkchester community, which is

---

[1] "Goobs" is a nickname for appellant among his acquaintances. Appellant's identity is not disputed.

adjacent to the 1500 block of Eaton Road in Southeast Washington, D.C., the location of the shooting. Mr. Grandson moved away from Parkchester in 2007, but visits the community periodically.[2]

On January 25, 2016, Mr. Grandson, accompanied by Eugenia Young, was driving through Parkchester when he saw appellant. The two men locked eyes, which prompted Mr. Grandson to tell Ms. Young that if appellant had a gun, he believed appellant would try to kill him. As Mr. Grandson turned onto Eaton Road, his vehicle became lodged in the snow. Mr. Grandson remained in the driver's seat while Ms. Young exited the vehicle to try to remove snow from around the tires.

Shortly thereafter, Mr. Grandson saw appellant approaching on foot. Appellant then shot Ms. Young four times in the abdomen, causing her to collapse in the snow. Mr. Grandson opened his door in an attempt to exit the vehicle, and appellant shot him twice through the open door — once in the back of the head and once in the left hand. Both Mr. Grandson and Ms. Young were transported to

---

[2] Although the details of their acquaintance are not the subject of appeal, the trial court recognized their acquaintanceship as an underlying factor in this case. Mr. Grandson maintains that appellant killed his older brother in 2007. For this reason, at sentencing, the trial court recognized that appellant was motivated to shoot Mr. Grandson.

emergency rooms and survived with immediate injuries and long-term health complications, all directly attributable to the gunshot wounds inflicted by appellant. Mr. Grandson, in particular, testified to his physical pain and several injuries, including the protracted impairment of the function of blood vessels as well as nerves in his head, neck, back, left hand, and the left side of his body generally. Many of his injuries required immediate and ongoing medical treatment, including a follow-up appointment to remove the bullet from his scalp and follow-up neurology appointments to monitor the healing of his vertebrae because of the concerns of potential damage to his spinal cord.

A jury trial commenced on February 5, 2019. Approximately seven days after the trial began, the government notified the trial court that it discovered a photograph on a social media website, Instagram, of appellant sitting in the courtroom. The photograph was posted by Instagram user account "fatyee_lm3ent." The photograph was posted with the caption "Free goobs_ He innocent!!"[3] To minimize the risk of

---

[3] The formatting of the Instagram comment is preserved from the original. Additionally, it is not readily apparent from inspection of the trial record whether the user account captioned their post with the text at issue or immediately commented on their post with the text. This distinction, to the extent it may exist, is not relevant.

similar photographs being taken during the trial, the government requested that all cell phones be checked at the door. The trial court granted this request.

On February 12, 2019, after the close of evidence, appellant, through counsel, informed the trial court that other persons had commented on the Instagram post. One of these posters was Instagram user account "pr3miumsupply," which, according to the account's description, is associated with a company called Premium Supply. The trial court identified the following comments on the post as troubling:

> Small [world] my auntie on jury duty for that[.[4]]
> . . .
> I ain't been d[o]wn there since last week ask her how it's looking[.[5]]
> . . .
> make sure she say not guilty n Iont even no bra but free em[.[6]]
> . . .
> She said it's not looking too good, but she wit[h] him[.[7]]

---

[4] Comment by Premium Supply.

[5] Comment by "fatyee_Im3ent," responding to Premium Supply.

[6] Comment by "bmcurt," responding to Premium Supply.

[7] Comment by Premium Supply, responding to "fatyee_Im3ent."

The trial court discussed with both parties the potential of extra-judicial contact with a jury member, and ordered the government to investigate the matter.[8] The trial court then excused the jury for two days to allow the government to investigate the situation surrounding the social media posts.

The next day, the government advised the trial court that two individuals, whose names were not disclosed to the trial court and are not included in the record, were identified as the Instagram account holders for Premium Supply. Both knew appellant personally. The government advised that one of the individuals had been in court to watch the trial. Both individuals indicated to the government that they did not create the original Instagram comment authored by Premium Supply, and provided information of four other individuals allegedly with administrative access to Premium Supply's social media account. The government advised the trial court

---

[8] As an additional measure, the trial court, under seal, individually inquired of the five female jurors whether they (1) had spoken to anyone about the case; (2) had any nieces or nephews with whom they had spoken about the case; (3) were familiar with or knew anyone who managed or worked for a company called Premium Supply; and (4) had Instagram accounts. All five jurors responded that they had not spoken with anyone about the case and, although some had Instagram accounts, they were not familiar with Premium Supply or its Instagram handle "pr3miumsupply." With the parties' apparent consent, the court reviewed publicly accessible information regarding the accounts the jurors were following on Instagram.

that it would continue investigating potential connections between any juror and the individuals with administrative access to the Premium Supply Instagram account.

Appellant then moved for a mistrial due to alleged jury misconduct for extra-judicial communications. The trial court, however, withheld ruling on appellant's motion at that time to allow the government to continue its investigation into the matter.

The following day, the government advised the trial court that its investigation did not produce evidence that any of the individuals associated with the Premium Supply account had contact with any member of the jury. The trial court, at that point, stated he was not inclined to grant appellant's motion due to a lack of any evidence supporting misconduct. The trial court then conducted a voir dire of each juror individually, inquiring whether they recognized a company called Premium Supply or any of the names associated with the "pr3miumsupply" account, and whether they had spoken to anyone about the case. All fourteen jurors responded that they had no such knowledge and had not spoken to anyone about the case.

Appellant renewed his motion for a mistrial, arguing his right to an impartial jury had been impinged, and the government's investigation had neither confirmed

nor disproved any connection or contact between a member of the jury and the individuals associated with Premium Supply.  When asked if there was anything the defense would request the government do further, defense counsel responded, "I cannot think of what I would ask them specifically to do. . . . So, Your Honor, I really can't."  The trial court then denied appellant's motion for a mistrial, concluding there was no instance of jury tampering.  The trial court found nothing more than an unverifiable, anonymous claim that a juror had disclosed something about the case to a third party, and had revealed a bias in favor of acquitting appellant.  It also found that appellant acknowledged that the government had exhausted its investigative measures while delaying the trial for forty-eight hours.[9]

Following closing arguments, the jury returned a verdict convicting appellant on thirteen of the seventeen counts.  The jury found appellant guilty of one count of AWIKWA, one count of AAWA, one count of ASBIWA, and three related counts of PFCV as to Mr. Grandson.  The jury also convicted appellant of the same as it relates to Ms. Young, as well as one additional count of UPF.  Following sentencing, this timely appeal followed.

---

[9] Additionally, the trial court recognized that the government, having thoroughly investigated the issue, would be most motivated to have such a juror removed because the potential jury misconduct, if realized, would benefit appellant. See *supra* Instagram comments ("make sure she say not guilty").

## II.    Discussion

Appellant argues that the trial court abused its discretion in denying his motion for a mistrial, and that there was insufficient evidence to support a conviction for aggravated assault while armed as to Mr. Grandson.  We disagree and affirm the defendant's convictions.  Appellant also argues that some of his convictions merge. We agree and remand to the trial court on that issue.

### A. Denial of Motion for Mistrial

Appellant raises two related arguments in challenging the trial court's denial of his motion for a mistrial: (1) that the trial court's inquiry of the jurors was inadequate; and (2) that the government failed to meet its burden of demonstrating there was no jury tampering.  We address these arguments in turn.

"[A] mistrial is a severe remedy, one to be taken only in circumstances manifesting a necessity therefor[e]," and given to the broad discretion of the trial court.  *Bost v. United States*, 178 A.3d 1156, 1191 (D.C. 2018) (cleaned up). Relatedly, "the determination of juror bias or prejudice," the premise of the motion

for mistrial, "lies particularly within the discretion of the trial court." *Bellamy v. United States*, 810 A.2d 401, 408 (D.C. 2002) (cleaned up). "The remedy for allegations of juror partiality," including juror tampering, "is a hearing in which the defendant has the opportunity to prove actual bias." *Young v. United States*, 694 A.2d 891, 894 (D.C. 1997) (citation omitted). Such a determination is "reversible only for a clear abuse of discretion, and the findings of fact underlying that determination are entitled to great deference." *Bellamy*, 810 A.2d at 408 (cleaned up). The trial court also has "considerable discretion in conducting an investigation into alleged juror misconduct." *Id.*; *Young*, 694 A.2d at 896 (declining to remand for appellant to further explore the potential of juror tampering where the trial court had already held a hearing).

Appellant, claiming there was evidence of jury tampering, argues that an unidentified member of the jury improperly communicated with a third party, which deprived him of a fair trial with an impartial jury. He argues that, irrespective of the fact that any potential bias would be in his favor, the following comments from an Instagram post are evidence of a juror's bias: "Free goobs[.] He innocent!!"; "Small [world] my auntie on jury duty for that"; "I ain't been d[o]wn there since last week ask her how it's looking"; "She said it's not looking too good, but she wit[h] him"; and "make sure she say not guilty [and] [I don't] even no bra but free em."

The trial court took great care to investigate this potential instance of jury tampering and juror bias by voir diring each of the five female jurors and authorizing the government to conduct its own two-day investigation into the matter. The voir dire of the five female jurors did not reveal any improper juror communication or bias toward or against appellant. Even further, the trial court's voir dire of every member of the jury on the matter did not reveal any improper juror communication or bias toward or against appellant. Likewise, the government, having investigated individuals associated with the social media posts, advised the trial court that there was no evidence that the individuals had contact with any member of the jury.

At the conclusion of the government's investigation, the trial court determined that the claim of alleged misconduct by an anonymous juror was unverifiable and without any evidence to support it. Notably, appellant was unable to identify any additional steps for the government to take in its investigation during the timeframe allotted by the trial court and appellant did not pursue the issue further. Appellant also never requested that the government expand the scope of the investigation or that the trial court expand the scope of its voir dire of the jury. Accordingly, we conclude the trial court took appropriate, definitive steps to determine whether there was jury tampering or bias by authorizing a two-day investigation and polling each

juror. The trial court correctly exercised its discretion to determine the credibility of the witnesses during voir dire and concluded that if there was any evidence of bias, it was anonymous and unverified.

Appellant argues that the trial court was required to grant a motion for a mistrial unless the government satisfied an affirmative burden to demonstrate that there was no evidence of jury tampering. That contention is in error; whether the trial court should grant a motion for a mistrial based on juror misconduct operates on a burden shifting framework. As articulated in *Al-Mahdi v. United States*,

> "[w]here . . . the impartiality of a juror has been plausibly called into question, it is the responsibility of the trial judge to hold a hearing to determine whether the allegation of bias has merit." *Medrano-Quiroz v. United States*, 705 A.2d 642, 649 (D.C. 1997). The judge must conduct "a thorough inquiry . . . into whether the defendant suffered actual prejudice." *Hill v. United States*, 622 A.2d 680, 684 (D.C. 1993) (emphasis in the original); *see also Smith v. Phillips*, 455 U.S. 209, 215, 71 L. Ed. 2d 78, 102 S. Ct. 940 (1982) ("The remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."). "Where, following a hearing, the defendant has established a substantial likelihood of actual prejudice from the unauthorized contact, . . . 'all reasonable doubts [about the juror's ability to render an impartial verdict must] be resolved in favor of the accused.'" *Hill*, 622 A.2d at 684 (quoting *United States v. Williams*, 262 U.S. App. D.C. 112, 128, 822 F.2d 1174, 1190 (1987)); *accord, Medrano-[Quiroz]*, 705 A.2d at 650. Thus, upon a prima facie showing of juror bias or partiality, "it is the government's burden to demonstrate that the juror's contact with extraneous information was

> harmless or non-prejudicial." *Hill*, 622 A.2d at 684. To go forward with the trial, the evidence of record must justify a high degree of confidence that the likelihood of juror partiality has been rebutted. "If the government does not meet its burden, then the court is obliged to declare a mistrial," *Parker v. United States*, 757 A.2d 1280, 1287 (D.C. 2000), or, if possible, to grant other adequate relief (such as excusing the affected juror).

867 A.2d 1011, 1018-19 (D.C. 2005). Applying that framework here, we are satisfied that the trial court properly denied appellant's motion for a mistrial because appellant failed to carry his burden, after the court's thorough investigation, to establish a substantial likelihood of actual prejudice from unauthorized contact.

The trial court conducted a sufficiently thorough investigation into whether the defendant suffered actual prejudice due to extra-judicial communications. As detailed above, the court extensively questioned the jurors who were most likely to have engaged in extra-judicial communications as well as the entire jury to ensure there were no impermissible extra-judicial communications. Additionally, the court enlisted the government in aid of its investigation and the government was unable to determine that any individual with access to the Premium Supply account had impermissible extra-judicial communications with a juror. The fact that appellant was unable to identify any additional steps for the court, or the government, to take

in investigating this claim of juror misconduct supports our conclusion that the investigation was appropriately thorough.

Appellant then possessed the initial burden of persuasion to "establish[] a substantial likelihood of actual prejudice from the unauthorized contact."[10] *Id.* at 1018. Appellant failed to carry this burden. After a thorough investigation, there was no evidence that the alleged extra-judicial communication actually took place or that there was otherwise any veracity to the Instagram comments at issue. Appellant does not contend otherwise, and instead he rests on the erroneous assertion the government bore the initial burden. Moreover, even if an extra-judicial communication did take place, the record lacks any evidence that a juror's decisionmaking was influenced, and thus, that the defendant was actually prejudiced. Without this evidence, we cannot conclude that appellant satisfied his burden. As a result of this conclusion, we do not need to consider whether the

---

[10] In *Al-Mahdi* and the cases cited therein, we discuss the defendant as having the initial burden of persuasion of proving actual prejudice. This framing was based on the fact that, in each case, the defendant argued that they were prejudiced by alleged juror misconduct. *See, e.g., Al-Mahdi*, 867 A.2d at 1017; *Medrano-Quiroz v. United States*, 705 A.2d 642, 659-50 (D.C. 1997); *Hill v. United States*, 622 A.2d 680, 683-84 (D.C. 1993). In instances where the government is the movant, however, it appears to us that the initial burden of persuasion should fall on the government as the party asserting actual prejudice. *See Hallman v. United States*, 410 A.2d 215, 217 (D.C. 1979) ("The burden of showing prejudice to support a motion for mistrial is upon the movant.").

government would have satisfied its burden of proving that any extra-judicial communication was harmless or non-prejudicial. Accordingly, we conclude that the trial court did not abuse its discretion in denying his motion for a mistrial.

## B. Sufficient Evidence for AAWA

Appellant also argues that there was insufficient evidence to support a conviction for AAWA, where appellant shot Mr. Grandson in the back of the head at close range. As a threshold matter, the government contends that appellant failed to raise this argument at trial by moving for a judgment of acquittal.[11] Yet assuming appellant did preserve his claim, we nonetheless conclude that the government's evidence was sufficient to support Mr. Grandson's conviction of AAWA. *Foster v. United States*, 218 A.3d 1142, 1144 (D.C. 2019) ("We review challenges to the sufficiency of the evidence de novo, considering all the evidence in the light most

---

[11] Without delving into the law of preservation, we note that the factual record is far from clear. Although in his brief to this court, Mr. Headspeth agrees with the government that his trial counsel did not make an MJOA motion "at anytime," neither Mr. Headspeth nor the government acknowledges that (1) defense counsel indicated an interest in making such a motion on February 12, 2019, prompting the court to respond "we'll do that," and (2) the docket entry for that day reflects that "[t]he court has denied the MJOA in this case."

favorable to the verdict and according deference to the factfinder to weigh the evidence, determine credibility, and draw justifiable inferences of fact.").

"A person commits the offense of aggravated assault if [u]nder circumstances manifesting extreme indifference to human life, that person intentionally or knowingly engages in conduct which creates a grave risk of serious bodily injury to another person, and thereby causes serious bodily injury." D.C. Code § 22-404.01(a)(2). This court has consistently defined "serious bodily injury" as "encompass[ing] 'bodily injury that involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.'" *White v. United States*, 207 A.3d 580, 588 (D.C. 2019) (quoting *Nixon v. United States*, 730 A.2d 145, 149 (D.C. 1999)). We have "often noted the high threshold of injury envisioned by the legislature in authorizing a maximum prison sentence for . . . assaults that . . . result in life-threatening or disabling injuries, including stab wounds, intense burns, and broken bones." *Id.* (internal quotations and citations omitted). "The victims [of such assaults] typically required urgent and continuing medical treatment, [] surgery[], carried visible and long-lasting (if not permanent) scars, and suffered other consequential damage, such as significant impairment of their faculties." *Id.* (quoting *Swinton v. United States*, 902 A.2d 772,

775 (D.C. 2006)). However, "the fact that an individual suffered from knife or gunshot wounds does not make that injury a per se 'serious bodily injury.'" *Bolanos v. United States*, 938 A.2d 672, 678 (D.C. 2007) (quoting *Zeledon v. United States*, 770 A.2d 972, 977 (D.C. 2001)). The determination of whether injuries constitute "serious bodily injury" is fact-intensive and must be supported by evidence in the record. *See Nixon*, 730 A.2d at 151 ("[D]ue to the absence of testimony from [the victims], or from health professionals who treated them, or medical records detailing the nature and extent of their injuries, the government failed to [prove] beyond a reasonable doubt that [the victims] suffered serious bodily injury . . . .").

The record here reveals extensive testimony by Mr. Grandson's treating physician, the chief of trauma surgery at the hospital, Dr. Babak Sarani, regarding the seriousness of Mr. Grandson's injuries, his medical records, and the medical treatment he received.[12] Dr. Sarani testified that "the blood vessel that travels right through the vertebrae as it goes up toward the brain" was severed from the gunshot. He described how Mr. Grandson's blood vessel was "torn straight in half . . . [and] spasm[ed] down as a defense mechanism" to stop him from bleeding to death. This

---

[12] We note that although Mr. Grandson's medical records from George Washington University Hospital were introduced at trial, they were not included in the record on appeal.

vital blood vessel previously supplied the brain with blood, but is now permanently damaged due to appellant's assault. Regarding the medical treatment prescribed by Dr. Sarani, during his initial hospital stay, Mr. Grandson received a full-body CAT scan, a cerebral angiogram,[13] and a neck brace.

The government contends there is ample evidence to affirm appellant's conviction for aggravated assault while armed due to the fact that Mr. Grandson faced a "substantial risk of death." *Bolanos*, 938 A.2d at 677. Here, Dr. Sarani's testimony provides important insight into the risk Mr. Grandson faced. This testimony unequivocally reflects that Mr. Grandson faced a substantial risk of death from the damage to his blood vessels, which could have caused him to bleed to death. This risk of imminent death is precisely the "high threshold of injury" contemplated as constituting a serious bodily injury. *White*, 207 A.3d at 588.

Appellant's contentions that these unrealized future concerns do not support a finding of serious bodily injury because they "did not manifest themselves" is inconsistent with our case law. We have consistently held that the relevant inquiry

---

[13] A cerebral angiogram is a test in which "a catheter was inserted . . . into the blood vessel in his leg and . . . passed up through the heart into the blood vessels that go into the brain to then image those vessels very carefully to give . . . a very specific portrayal of the type of injury he had sustained."

is into whether the victim was at substantial *risk* of death, not whether the risk actually manifested or was mitigated by the receiving of timely medical treatment. *See Freeman v. United States*, 912 A.2d 1213, 1222 (D.C. 2006) (holding that a victim still faced a substantial risk of hemorrhaging to death if a lodged bullet moved and damaged the aorta even though the victim was never in critical condition nor did the victim receive emergency surgery because the victim was stabilized on the scene). Dr. Sarani's expert testimony is unequivocal that Mr. Grandson faced a substantial risk of death. Accordingly, we conclude there was sufficient evidence to support appellant's conviction for AAWA against Mr. Grandson on the ground that he incurred "serious bodily injuries" due to the substantial risk of death his injuries posed. Because there is at least one ground sufficient to affirm appellant's conviction, we do not reach whether there was also sufficient evidence that Mr. Grandson incurred a serious bodily injury due to either extreme physical pain or a protracted loss or impairment of the function of a bodily member, organ, or mental faculty. *See Nixon*, 730 A.2d at 149.

### C. Merger of Convictions

Appellant also argues that some of his convictions merge. We agree and remand for the trial court to resolve the merger issues.

Appellant argues that his ASBIWA convictions (both as to Mr. Grandson and Ms. Young) should merge into his AAWA convictions, and that his six PFCV convictions should merge into one count for each victim. The government concedes to appellant's various merger arguments. *See Medley v. United States*, 104 A.3d 115, 132 (D.C. 2014) (noting that assault with significant bodily injury merges as a lesser-included offense of aggravated assault); *Matthews v. United States*, 892 A.2d 1100, 1106 (D.C. 2006) ("The general rule when the convictions for the predicate crimes [against separate victims] do not merge is that the associated PFCV convictions do not merge either."); *Campos-Alvarez v. United States*, 16 A.3d 954, 962 (D.C. 2011) ("[T]he government agree[s] that the PFCV convictions based on AWIKWA and AAWA [as to the same victim] merge . . . ."). Therefore, we remand the case to the trial court with instructions to merge appellant's convictions for AAWA and ASBIWA as to Mr. Grandson and merge the three PFCV convictions into a single conviction for PFCV. The trial court should also merge appellant's conviction for AAWA and ASBIWA as to Ms. Young and merge the three PFCV convictions into a single conviction for PFCV.

### III. Conclusion

Accordingly, we affirm appellant's conviction for aggravated assault while armed, and remand the case to address the convictions that merge.

*So ordered.*